**HOLIDAY ACRES PROPERTY OWNERS ASSOCIATION, INC., a Colorado nonprofit corporation, Plaintiff–Appellant,**

v.

**James R. WISE, Shannon K. Wise, Carl G. Wise, Rodney J. Cruz, Rebecca J. Cruz, Walter S. Moore, Kim A. Moore, Charles R. Allen and Stephanie L. Martin; Defendants–Appellees.**

No. 99CA0044.

Colorado Court of Appeals, Division III.

March 16, 2000.

As Modified on Denial of Rehearing July 6, 2000.

Gerald Sawatzky, Pagosa Springs, Colorado, for Plaintiff-Appellant.

Crane, Leake, Casey, Ehlers & Eggleston, Duke Eggleston, Durango, Colorado, for Defendants-Appellees.

Opinion by Judge JONES.

Plaintiff, Holiday Acres Property Owners Association, Inc. (Association), appeals the judgment entered, after a trial to the court, denying its request for a mandatory injunction against defendants, James R., Shannon K., and Carl G. Wise; Rodney J. and Rebecca J. Cruz; Walter S. and Kim A. Moore; Charles R. Allen; and Stephanie L. Martin. We affirm.

Chuck and Phyllis Bogert (general partners) formed a limited partnership, known as Holiday Acres, in order to develop a 500–acre subdivision consisting of 169 lots. The dispute here relates to the interpretation of paragraph 9 of the protective covenants recorded with Archuleta County, on May 17, 1974, that purport to restrict the use of mobile homes in the Holiday Acres subdivision. Paragraph 9, as amended in October 1976, provides:

> No trailer, camper, mobile home, or motor home shall be used at any time as a permanent residence except use of a trailer, camper, mobile home or motor home may be permitted during the above mentioned one year period permitted for construction and, in addition, may be used for periods of vacation use, but total vacation usage by any one owner may not exceed six (6) months in any calendar year.

The restrictive covenants also required that Holiday Acres approve any "building, fence, patio, or other structure" prior to construction. Thus, in response to inquiries from property owners, one of the general partners, who was also the sole member of the architectural committee, interpreted the mobile home provision as follows, in a letter:

> This is to inform you that double wide modular homes are permitted in Holiday Acres as long as they are permanently attached to the foundation. The tongues and axles must also be removed.
>
> There are numerous homes of this type in Holiday Acres and [they] are accepted by the community. In the [covenants] mention is made of no mobile homes, meaning no single-wide mobile homes.

Accordingly, during the fall and summer of 1996, defendants proceeded to construct dou-

ble-wide mobile homes on their lots. Other property owners perceived defendants' double-wide mobile homes as a threat to the value of the property in the subdivision. Therefore, on August 29, 1996, the owners called a meeting to establish a property owners' association with the stated purpose of enforcing the restrictive covenants. The Association was formed pursuant to the following provision in the covenants:

> When sixty (60) per cent or more of the tracts in the above described lands have been sold, the owners of such tracts may form a committee of such size and representation as may be agreed upon by a majority of such owners, which committee may undertake the obligation imposed upon Holiday Acres by paragraph 6 of these covenants.

After its incorporation, on September 27, 1996, the Association promptly notified defendants here that their double-wide mobile homes violated the restrictive covenants and, furthermore, warned one defendant not to proceed with his plans to relocate a double-wide mobile home to Holiday Acres from another area in Colorado.

Based on these perceived violations, the Association sought a mandatory injunction to compel defendants to remove the double-wide mobile homes from their lots. The trial court denied the plaintiff's requested injunctive relief, and this appeal followed.

## I.

The Association contends that the trial court erred in determining that it was equitably estopped from enforcing the covenant restricting the use of mobile homes. We perceive no error.

In an order dated June 17, 1998, the first judge to consider this case concluded that the term "mobile homes" as used in the covenants is not ambiguous, and, as a matter of law, prohibits double-wide structures from Holiday Acres, but did not order the structures removed. Because the parties differ on this point, we first consider whether the meaning of the term "mobile home" as used in the original and amended restrictive covenants is ambiguous as to whether it includes all types of factory built housing. We conclude that it is.

Interpretation and construction of covenants is a question of law which we review *de novo.* In the absence of contrary equitable or legal considerations, protective covenants that are clear on their face must be enforced as written. *Rossman v. Seasons at Tiara Rado Associates,* 943 P.2d 34 (Colo. App.1996).

Rules of construction for determining whether provisions of a document are ambiguous are applicable to protective covenants. *Hallmark Building Company v. Westland Meadows Owners Ass'n, Inc.,* 983 P.2d 170 (Colo.App.1999).

A written instrument is ambiguous when it is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of a term. *Ad Two, Inc. v. City & County of Denver,* 983 P.2d 128 (Colo.App.1999)(*cert. granted* Sept. 13, 1999).

The Association argues that the term "mobile home" as used in these covenants is unambiguous. It refers to the June 17th order in defining "mobile home" to include: a dwelling built upon a permanent chassis or frame, towed to the residential site utilizing axles and wheels that are attached to the chassis, and designed to be used without permanent foundation. Further, it argues that *Tucker v. Wolfe,* 968 P.2d 179 (Colo.App. 1998), compels the conclusion that the covenant prohibiting mobile homes cannot be expanded to prohibit modular homes.

There are indeed differences in the construction of trailer homes and mobile, modular, manufactured, and Department of Housing and Urban Development (HUD) sanctioned, and Uniform Building Code (UBC) sanctioned mobile homes. However, various bodies of law use the terms interchangeably. Therefore, we conclude that the term "mobile home," as used in the covenants here, is ambiguous. *See* State of Colorado, Division of Housing, *Brief History of Colorado Homes That Were Built in a Factory,* (1998)(for the most part, people use the terms mobile, modular, manufactured, HUD, UBC, and trailer interchangeably when referring to homes built in a factory).

For instance, in 1988, the Federal National Mobile Home Construction and Safety Standards Act was renamed the Federal Manufactured Housing Act. 42 U.S.C. § 5401, *et seq.* (1988). In Colorado, from 1931 through

1982, wheeled vehicles having a residential purpose were referred to in the statutes as "trailer coaches" and "mobile homes." *See, e.g.,* Colo. Sess. Laws 1931, § 1 at 485. In 1983, the General Assembly abandoned use of those terms and replaced them with the phrase "manufactured home" throughout what is now known as the "Title to Manufactured Homes Act," found at § 38–29–101, *et seq.,* C.R.S.1999. *See* Colo. Sess. Laws 1983, ch. 417, § 38–29–102 at 1448; Colo. Sess. Laws 1989, ch. 122 at 712.

Furthermore, in *Tucker,* a division of this court determined that "trailer houses" were mutually exclusive of double-wide mobile homes and manufactured housing. In making that distinction, the court emphasized the similarities between double-wide mobile homes and manufactured housing as follows:

> [T]hese forms of housing, although transported to a building site on wheels and axles, may, in appearance, be more similar to conventional housing than to trailer houses. . . . And, the primary function of double-wide mobile homes and manufactured housing is to provide a permanent dwelling place. Its mobility is secondary, relied on generally to transport it to its permanent location.

*Tucker v. Wolfe, supra; see generally* Barr, *The Right to Sell the "Im"mobile Manufactured Home in its Rent Controlled Space in the "Im"mobile Home Park: Valid Regulation or Unconstitutional Taking?,* 24 Urb. Law. 157 (1992) (as demand for mobile homes as a viable alternative to conventional housing increased, so did acceptance of mobile homes as permanent housing).

Because we conclude that the term "mobile home," as used in the covenants, is ambiguous, it is necessary to consider whether, under the circumstances here, the Association is estopped from enforcing the restrictive covenants against defendants. We conclude that it is.

■ The credibility of witnesses; the sufficiency, probative effect, and weight of all evidence, including documentary evidence; and the inferences and conclusions to be drawn from the evidence, are within the province of the trial court, and its treatment of them will not be disturbed on review unless clearly erroneous. *Cottonwood Hill, Inc. v. Ansay,* 709 P.2d 62 (Colo.App.1985).

■ Generally, concerning protective covenants, equity may fashion a remedy to effect justice suitable to the circumstances of the case. *First Hyland Greens Ass'n v. Griffith,* 618 P.2d 745, 747 (Colo.App.1980).

■ The elements of estoppel as they relate to the right to enforce a covenant are full knowledge of the facts, unreasonable delay in the assertion of the available remedy, and intervening reliance by and prejudice to another. *Woodmoor Improvement Ass'n v. Brenner,* 919 P.2d 928, 931 (Colo.App.1996).

■ Further, the doctrine of equitable estoppel may be applied to preclude enforcement, by the architectural control committee of a homeowners' association, of a restrictive covenant that inures to the benefit of all lot owners in the subdivision. *Woodmoor Improvement Ass'n v. Brenner, supra.*

Here, the undisputed evidence reveals that a general partner, cloaked with architectural review authority at the time the interpretation of the covenant was raised, clarified that "double wide modular homes are permitted in Holiday Acres as long as they are permanently attached to the foundation." Furthermore, testimony at trial revealed that many long-time residents had knowledge of permanent modular homes within Holiday Acres. As of September 1, 1995, the county building department had records of at least five mobile home permits issued to residents of Holiday Acres. One of the Association's members testified to the effect that the building and planning department records were sparse until fourteen years earlier and that, therefore, it was possible that there were other unrecorded mobile home permits issued before that period.

Notably, the Association issued a mobile home permit to one defendant, provided that he make a few exterior modifications to the home. One owner testified that she did not object to one mobile home because "it was being installed as a modular." And, another member of the Association resides in a mobile home herself. Finally, with record support, the trial court found that, although legal building standards are higher for modular homes, there is no visible difference between the two forms of housing.

Thus, in light of the reasonable interpretation of the term "mobile home" in the restrictive covenants and other evidence in the record, we conclude that the Association was aware of continuous and repeated variances in the application of the restrictive covenants. Likewise, we conclude that, because the Association had notice of such variances, the trial court did not err in finding that the Association unreasonably delayed seeking an injunction to enforce its remedy, assuming a remedy was necessary or available. Finally, we conclude that defendants' reliance on a general partner's approval of double-wide mobile homes, and on the fact that there were pre-existing mobile homes within Holiday Acres, was reasonable.

## II.

The Association further contends that the trial court erred in assessing attorney fees against it and in favor of the defendants. We disagree.

The trial court assessed attorney fees against the Association pursuant to § 38–33.3–123(1), C.R.S. 1999, which permits attorney fees to be awarded to the prevailing party in an enforcement action concerning a "common interest community," as defined in § 38–33.3–103(8), C.R.S. 1999.

That statute defines "common interest community" to mean:

Real estate described in a declaration with respect to which a person, by virtue of such person's ownership of a unit, is obligated to pay real estate taxes, insurance premiums, maintenance, or improvement of other real estate described in a declaration.

 We conclude that it is not necessary here to determine as a matter of law whether the Association is a common interest community because, by judicial admission, it has proclaimed itself to be such.

 A judicial admission is a formal, deliberate declaration which a party or counsel for the party makes in a judicial proceeding. Judicial admissions are conclusive on the party making them. Such admissions may be oral or written. Any fact may be the subject of a judicial admission. Parties, by way of judicial admissions, may stipulate away valuable rights. *See Kempter v. Hurd*, 713 P.2d 1274 (Colo.1986.)

The record reflects that the Association averred in responses to interrogatories that it is a common interest community and expressed rationale for so proclaiming. Additionally, other evidence from the Association makes the same claim.

Thus, because these declarations constitute a judicial admission that the Association is a common interest community, the trial court did not err in awarding attorney fees to defendants as the prevailing parties in an enforcement action under § 38–33.3–123(1).

Accordingly, the judgment is affirmed.

Judge NEY and Judge TAUBMAN concur.