In re the Matter of J.C.T., a minor child.

Paula Constantakis Young, Guardian Ad Litem; and Three Affiliated Tribes, Petitioners

v.

C.A.H., Respondent.

No. 06SC780.

Supreme Court of Colorado, En Banc.

Dec. 3, 2007.

Paula Constantakis Young, Denver, Colorado, Guardian Ad Litem for J.C.T.

American Indian Law Clinic, Jill E. Tompkins, Boulder, Colorado, Attorneys for Petitioner Three Affiliated Tribes.

Holme Roberts & Owen LLP, Richard L. Gabriel, Timothy M. Reynolds, David A. Tonini, Denver, Colorado, Attorneys for Respondent C.A.H.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

We granted certiorari to consider the limits of the probate court's jurisdiction with regard to the guardianship of minors and its consideration of their best interests.[1] J.C.T., a now ten-year-old boy, is at the heart of this conflict. Since before his first birthday, J.C.T. has been under the supervision of the Denver probate court. Based on a challenge by Respondent C.A.H. ("Guardian 1"), a former guardian of J.C.T., the court of appeals in *In re J.C.T.*, 155 P.3d 452 (Colo.App.2006), held that the probate court exceeded its subject matter jurisdiction during proceedings involving J.C.T.'s guardianship by intruding into an area of jurisdiction exclusively vested in the juvenile court. The court of appeals therefore vacated the probate court's order denying Guardian 1's petition for guardianship, and remanded the case with instructions to certify the action to the juvenile court. We now reverse the court of appeals' decision and reinstate the probate court's order.

2) Whether the court of appeals erred when it held that the appointment of the guardian ad litem as temporary guardian divested the probate court of jurisdiction and vested jurisdiction with the juvenile court under section 19–3–102, C.R.S. (2006).

We hold that, in evaluating the child's best interests, the probate court did not exceed its jurisdiction by directing the guardian ad litem ("GAL") to find a permanent guardian for J.C.T. or by considering the potential for an eventual adoption. In addition, we find that the appointment of the GAL as temporary guardian for J.C.T. did not divest the probate court of its jurisdiction.

## II. Facts and Procedural History

J.C.T. was born on February 25, 1997. When he was only ten months old, his mother placed him in the care of an acquaintance, Guardian 1, and subsequently consented to a probate court granting guardianship of J.C.T. to Guardian 1. Soon thereafter, as part of a later hearing, the probate court appointed Paula Constantakis Young as the GAL to investigate Guardian 1's fitness. Guardian 1 was found to be a proper legal guardian, and J.C.T. remained in her care for a period of four years. J.C.T.'s father has not been identified and has not been involved in this matter.

At the time of her appointment, the GAL requested involvement from the Denver Department of Human Services ("DHS"). DHS declined to participate on the grounds that Guardian 1 was properly caring for J.C.T. and there was an existing forum for Guardian 1 and J.C.T.'s mother to obtain court orders, namely, the probate court.

J.C.T. lived with Guardian 1 and her family in both Colorado and Georgia. During that four year time period, J.C.T. experienced considerable mental and behavioral problems. He was hospitalized for depression for four days in 2001, at the age of four.

In 2002, J.C.T. and Guardian 1's daughter visited Guardian 1's mother, A.S. ("Guardian

---

1. We granted certiorari on two specific issues:
   1) Whether the court of appeals erred by holding that a probate court exceeded its jurisdiction in directing a guardian ad litem to find a permanent guardian for a ward and considering the potential for an eventual adoption in its evaluation of the best interests of the ward.

   2) Whether the court of appeals erred when it held that the appointment of the guardian ad litem as temporary guardian divested the probate court of jurisdiction and vested jurisdiction with the juvenile court under section 19–3–102, C.R.S. (2006).

2"), and stepfather in Colorado. During the visit, Guardian 2 and her husband initiated a proceeding before a Georgia court, alleging that both children had been sexually and physically abused and seeking custody of them. The GAL was reappointed for J.C.T., and the GAL entered an appearance in Georgia. The Georgia court ultimately entered a directed verdict in Guardian 1's favor, immediately returning custody of Guardian 1's daughter to her. The court refused jurisdiction over J.C.T., however, and instead deferred to the Denver probate court. The probate court then issued an order suspending Guardian 1's guardianship of J.C.T. and appointing Guardian 2 as temporary guardian. In doing so, the court specifically stated that it was not finding that Guardian 1 acted improperly toward J.C.T.; rather, the court determined that it was in J.C.T.'s best interest that the status quo be maintained, and that J.C.T. should stay in Colorado where he was visiting, because relocating him could further jeopardize his mental health.

In February 2003, the Mandan, Hidatsa, and Arikara Nation, also known as the Three Affiliated Tribes ("the Tribes"), moved to intervene, asserting their standing on the basis of J.C.T.'s status as an enrolled tribal member and thus, an Indian child under the Indian Child Welfare Act ("the ICWA"), 25 U.S.C. sections 1901–63 (2005). The Tribes also filed a motion to transfer jurisdiction to the tribal court. While acknowledging the applicability of the ICWA, the probate court found good cause not to transfer jurisdiction under 25 U.S.C. section 1911(b), and denied the motion.[2] The Tribes did not appeal this ruling.

J.C.T. continued to live in Colorado with Guardian 2 for approximately two years. Near the end of that time, a therapist, who evaluated J.C.T. under court orders, recommended that J.C.T. stay with Guardian 2, but cautioned that other resources should be considered for the future because Guardian 2 was sixty nine years old and J.C.T. only seven years old. As time went on, the GAL

expressed increasing concern to the probate court regarding Guardian 2's mental state, her communication with J.C.T. about the case, and her inability to properly manage J.C.T.'s asthma.

In August 2004, the probate court issued an order, expressing its doubts as to whether any of the parties were fit to serve as J.C.T.'s guardian. At that time, the court directed the GAL to find a permanent successor guardian for J.C.T. Several weeks later, the court terminated Guardian 2's temporary guardianship and appointed A.B. ("Guardian 3") as a substitute temporary guardian. Guardian 3 is a foster mother and experienced child advocate, and was intended by the probate court to serve as a neutral and independent placement for J.C.T. Over time, the GAL and J.C.T.'s therapist realized that Guardian 3 was actually aligned with Guardian 1, allowing contact between J.C.T. and Guardian 1 that the probate court had previously limited. Moreover, Guardian 3 began to interfere with J.C.T.'s therapy. These acts were in direct violation of the probate court's orders.

During this time, the GAL began working with adoption agencies with the hope of finding a family that could serve as permanent successor guardian for J.C.T., and possibly an eventual adoptive family, in the event that the court did not choose Guardian 1 or Guardian 2. The court heard evidence regarding Guardian 1's petition for permanent guardianship of J.C.T. at two hearings in the spring of 2005. The GAL testified at the second hearing that there was a family of Native American ancestry that was interested in serving as a permanent guardian and possible adoptive family for J.C.T. At the end of this hearing, the court removed Guardian 3 as temporary guardian, citing her previous violations of court orders and noting her inability to remain impartial. In doing so, the court declared J.C.T. to be a ward of the court temporarily and stated that J.C.T. would stay with the GAL until the court

**2.** 25 U.S.C. § 1911(b) (2000) states:

In any State court proceeding [concerning] . . . an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the

contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe. . . .

made a decision regarding permanent guardianship. In its written order, the court referred to the GAL as the "Guardian Designee."

Soon after that hearing, the probate court denied Guardian 1's petition for guardianship. Guardian 1 appealed from this order. Finding that the probate court exceeded its jurisdiction by engaging in de facto adoption proceedings, the court of appeals vacated the probate court's order and remanded the case with instructions to certify the action to the juvenile court. We now reverse the court of appeals' ruling.

### III. The Probate Court's Proper Exercise of Jurisdiction

■ Subject matter jurisdiction is "a court's power to resolve a dispute in which it renders judgment." *Trans Shuttle, Inc. v. Pub. Utils. Comm'n,* 58 P.3d 47, 49–50 (Colo. 2002) (citing *In re Marriage of Stroud,* 631 P.2d 168, 170 (Colo.1981)). The issue of jurisdiction is a legal question that we review de novo. *Swieckowski v. City of Fort Collins,* 934 P.2d 1380, 1384 (Colo.1997). In doing so, we consider both "the nature of the claim and the relief sought." *Trans Shuttle,* 58 P.3d at 50.

Under the Colorado Constitution article VI, section 9(3) and section 13–9–103(1)(f), C.R.S. (2007), the Denver probate court has original and exclusive jurisdiction over the "administration of guardianships of minors." Moreover, the court has "full power to make orders, judgments, and decrees and take all other action necessary and proper to administer justice in the matters which come before it." § 15–10–302, C.R.S. (2007). In this case, the court of appeals acknowledged the jurisdiction of the probate court over issues of J.C.T.'s guardianship. However, the court ruled that the probate court exceeded its jurisdiction when it instructed the GAL in August 2004 to find a permanent guardian for J.C.T., and considered the potential for an eventual adoption in evaluating the best interests of J.C.T.

■ The court of appeals reasoned that these actions amounted to a de facto adoption proceeding, an area within the exclusive jurisdiction of the juvenile court.[3] The Petitioners, on the other hand, argue that the probate court was merely exercising its jurisdiction over a guardianship matter. The essential question before us, therefore, is whether the probate court was conducting a de facto adoption proceeding. We find that it was not.

The Colorado Children's Code states that proceedings "for the adoption of a person of any age" fall within the exclusive and original jurisdiction of the juvenile court. § 19–1–104(1)(g), C.R.S. (2007). In addition, the Code notes that nothing in its jurisdictional provisions deprives the district court of the authority to appoint a guardian for a child. § 19–1–104(4). A district court is only required to certify a question of legal custody to the juvenile court if "a petition involving the same child is pending in juvenile court or if continuing jurisdiction has been previously acquired by the juvenile court." § 19–1–104(4)(a). That circumstance does not apply here. Moreover, a district court *may* request that the juvenile court make recommendations regarding guardianship or legal custody at any time, but such requests do not *require* the district court to certify the case to the juvenile court unless the situation described above exists. *See* § 19–1–104(4)(b).

Contrary to the court of appeals' holding, an adoption does not occur simply because a court plans for permanency or considers a child's future when exercising its proper jurisdiction. In ruling that the probate court's exclusive focus, as well as that of the GAL, was on the adoption of J.C.T., the court of appeals emphasized the GAL's extensive contacts with various adoption agencies for the purpose of finding J.C.T. a permanent home. In addition, the court highlighted the probate court's discussion of the potential adoptive family at the March 2005 hearing. Indeed, it is true that the probate court wanted to avoid placing J.C.T. in another stranger's home for

**3.** Article VI, section 15 of the Colorado Constitution establishes the juvenile court of the city and county of Denver. Denver is the only county to have separate probate and juvenile courts. Other counties in Colorado handle probate and juvenile matters in their district courts.

some temporary time period, and thus strived to find a family that could provide some stability for J.C.T. in the long term. This does not, however, constitute an adoption.

Section 19–5–203, C.R.S. (2007), provides that a child is not available for adoption unless a parent or guardian gives his or her consent, a court receives an affidavit or sworn testimony that the child has been abandoned for one year or more, or a court enters an order "terminating the parent-child legal relationship." No termination of parental rights proceeding has ever occurred in this case. No one has averred in the case of a kinship or custodian adoption that J.C.T. has been abandoned for one year or more. Although J.C.T.'s father has not participated in these proceedings and J.C.T.'s mother long ago ceased her participation, neither has consented to adoption. J.C.T. is not "available" for adoption under section 19–5–203. Mere instructions to find a permanent home for J.C.T. cannot suddenly render him "available" and thus, initiate adoption proceedings.

Generally, probate courts establish guardianships for the purpose of protecting and caring for those in society who cannot fend for themselves, such as minors and incapacitated persons. *See* Peter Mosanyi, Comment, *A Survey of State Guardianship Statutes: One Concept, Many Applications,* 18 J. Am. Acad. Matrimonial Law. 253, 255 (2002) (discussing guardianship in the national context). In his or her court-appointed role, a guardian is "responsible for the ward's physical well-being," including the provision of "shelter, food, clothing, medical care or other necessities of life." *Id.* The guardian has essentially the same authority and responsibilities with regard to the child as a parent would have, with the exceptions that the guardian typically does not provide the financial resources to support the child and serves solely at the pleasure of the appointing court. *See id.; see also* § 15–14–208(1), C.R.S. (2007) ("[A] guardian of a minor ward has the powers of a parent regarding the ward's support, care, education, health, and welfare.").

In Colorado, the probate court "may appoint a guardian for a minor if the court finds the appointment is in the minor's *best interest,*" and 1) the parents have consented; 2) parental rights have previously been terminated; 3) the parents are incapable or unwilling to exercise their parental rights; or 4) a previously appointed third-party guardian has subsequently died or become incapacitated and did not provide for a successor by will or written instrument. *See* § 15–14–204(2), C.R.S. (2007) (emphasis added). Moreover, section 15–14–112(3), C.R.S. (2007), allows the court to appoint successor guardians in the event of a vacancy. Ultimately, the probate court "is granted broad discretion in all cases involving protected persons." *O.R.L. v. Smith,* 996 P.2d 788, 790–91 (Colo.App. 2000) (citing *Sweeney v. Summers,* 194 Colo. 149, 155, 571 P.2d 1067, 1070 (1977)).

Initially, in this case, Guardian 1 was appointed guardian of J.C.T. upon his mother's consent. Since that time, J.C.T.'s parents have not exercised their parental rights, and the probate court has appointed subsequent guardians in furtherance of J.C.T.'s best interest. Considering J.C.T.'s mental health and utmost well-being, the probate court suspended Guardian 1's guardianship and appointed Guardian 2 as temporary guardian. Later, when Guardian 2 was no longer capable of properly caring for J.C.T., the court appointed Guardian 3 as a substitute guardian. The court made that appointment believing Guardian 3 to be a neutral individual who would protect J.C.T. from unnecessary conflict among the parties. When this failed to be the case, the probate court again looked to J.C.T.'s best interest. Wishing to avoid any greater disruption to J.C.T. that could be caused by placing him with another stranger, the court made J.C.T. its ward and appointed the GAL, who had been part of J.C.T.'s life since he was only one year old, as his guardian designee. In each of these instances, the court was acting pursuant to its authority under sections 15–14–204(2) and 15–14–112(3). We find that, by both considering J.C.T.'s current needs and looking toward his future well-being, the probate court was furthering the intent behind the Probate Code's guardianship of minors provisions.

For over seven years as of the time of this appeal, the probate court supervised J.C.T.'s

care, placing him with three different temporary guardians, as well as with the GAL for a limited period. For children like J.C.T., permanency and stability are unquestionably in their best interest.[4] Over the years, the probate court periodically evaluated the appropriateness of each guardian in light of J.C.T.'s needs. Ultimately, the court recognized that the available parties were no longer able to meet those needs; thus, it instructed the GAL to look elsewhere.

In ruling that the probate court exceeded its jurisdiction, the court of appeals found that "the prospect of adoption was a significant factor" in the court's denial of Guardian 1's petition for permanent guardianship. *See In re J.C.T.*, 155 P.3d at 456. To a certain degree, this is true. The probate court did note J.C.T.'s positive visits with the potential adoptive family. It discussed the family's ability to meet J.C.T.'s needs, and it recognized that the family would be an appropriate placement under the ICWA.[5] Consideration of this potential adoptive family, however, was entirely proper. *See In re R.M.S.*, 128 P.3d 783, 788 (Colo.2006) ("A court may consider all relevant facts and circumstances to determine the best interest of the child."). As this court previously explained in *L.L. v. People*, "guardianship orders are merely a

plan for permanency that is subject to change as warranted by the best interests of the children." 10 P.3d 1271, 1277 (Colo.2000) (discussing appropriateness of permanent guardianship in juvenile court). Here, the probate court's consideration of the potential future adoption was warranted by the best interests of J.C.T.[6]

Moreover, the potential adoption was only one of the many factors the probate court considered in denying Guardian 1's petition. For example, in its April 2005 order, the court noted that J.C.T. exhibited many emotional and psychological problems when initially placed with Guardian 1, issues that were not as evident when J.C.T. was placed with either Guardian 2 or Guardian 3. The court stated that, "In no way [could J.C.T.'s] prior placement in [Guardian 1's] home be described as successful." In addition, one of the therapists who evaluated J.C.T. testified in the probate court that J.C.T. would be best served by a placement without younger children in the home, because younger children tend to make J.C.T. feel threatened and cause him to behave aggressively. At the time of her petition, Guardian 1 had three children younger than J.C.T. in her home, as well as one older child, and she operated a

---

4. *See, e.g., L.L. v. People*, 10 P.3d 1271, 1274, 1277 (Colo.2000) (recognizing children's need for stability and permanency and thus upholding placement of children in permanent guardianship of foster parents). While *L.L.* was a case of guardianship in the juvenile court, its best interest of the child standard is also applicable in the context of probate court guardianships. *See In re R.M.S.*, 128 P.3d 783, 787 (Colo.2006) (discussing guardianship in probate court and finding "that the paramount consideration in appointing a guardian is the best interest of the minor").

5. The Code of Colorado Regulations provides that the county child welfare department:

shall make placements of eligible Native American children for adoption according to the following order of preference, unless there is good cause to the contrary as determined by the court:
A. A member of the child's extended family.
B. Other members of the Native American child's tribe.
C. Other Native American families.
12 Colo.Code Regs. § 2509–4, 7.309.83 (2007) (delineating order of placement preferences under the ICWA).

In this case, the mother of the potential adoptive family is part Native American. Guardian 1 is not of Native American ancestry; thus, under the ICWA, the potential adoptive family would be a more appropriate placement for J.C.T., absent good cause to the contrary.

6. At the March 2005 hearing, the probate magistrate initially stated that she intended to treat the hearing similarly to an adoption proceeding in that she would have each party present his or her qualifications, rather than have the contesting parties cross-examine each other and help to determine whether the other party was an appropriate placement for the child. Then, due to a lack of previous consent by Guardian 1 for a magistrate to hear the proceeding, the magistrate stepped down and was replaced by a probate court judge. C.A.H. objected to the proceeding being treated like an adoption and the court took notice of that. There was no further discussion on the subject. We find that while the magistrate may have used an inappropriate choice of words to describe the intended format of the proceedings, the hearing itself did not constitute an adoption.

day-care center in her home. Further, the probate court specifically recognized the Tribes' opposition to any guardianship placement with Guardian 1. The court concluded that "[a]fter careful consideration of [J.C.T.'s] needs, the likelihood that [Guardian 1] cannot meet his needs, and the potential for a successful adoption elsewhere, the Court finds that the balance tips heavily against placement with [Guardian 1] and in favor of placement with the family recommended by the Guardian ad Litem."

This best interest evaluation was proper with regard to J.C.T.'s guardianship under section 15–14–204. It does not constitute an adoption, or a de facto adoption. If, in the future, J.C.T.'s guardians should wish to adopt him, they must petition the juvenile court, which possesses the sole authority to conduct adoptions. The General Assembly anticipated adoption by a legal guardian when it drafted section 19–5–203(1)(k), which provides that a child may be available for adoption upon:

> Submission of an affidavit or sworn testimony of the legal custodian or legal guardian in a custodial adoption that the birth parent or birth parents have abandoned the child for a period of one year or more ... and that the legal custodian or legal guardian seeking the custodial adoption has had the child in his or her physical custody for a period of one year or more.

While it is possible for a guardian to adopt his or her ward, that is not what occurred in this case.

In sum, we find that the probate court properly acted within its jurisdiction when it considered J.C.T.'s need for stability and instructed the GAL to find a permanent guardian. In reaching this conclusion, we do not intend to minimize the importance of the juvenile court and its expertise in matters regarding children. The expertise of the juvenile court, however, does not pose a jurisdictional defect in terms of the probate court's authority over J.C.T.'s guardianship. Focusing our review of jurisdiction on the nature of the claim and the relief sought, we conclude that the relief sought here was that of a permanent guardianship, and we hold that the court of appeals erred in equating the probate court's actions with a de facto adoption. Despite the court of appeals' assertion to the contrary, the probate court acted appropriately within its jurisdiction.

## IV. Appointment of the GAL as Guardian Designee

■ As a separate ground for vacating the probate court's order, the court of appeals determined that the probate court improperly appointed itself as guardian, and the GAL as guardian designee, of J.C.T. *In re J.C.T.*, 155 P.3d at 456. The court of appeals found that this improper appointment potentially left J.C.T. within the definition of a neglected or dependent child under section 19–3–102(1)(e), C.R.S. (2007), divesting the probate court of jurisdiction and vesting jurisdiction with the juvenile court. We reject the appellate court's reasoning and hold that the appointment of the probate court as guardian was not improper under the facts of this case.

The Colorado Children's Code provides that, in addition to adoption actions, the juvenile court has exclusive original jurisdiction in proceedings "[c]oncerning any child who is neglected or dependent." § 19–1–104(1)(b). Under section 19–3–102(1)(e), in relevant part, a child is considered neglected or dependent if: "(c) [t]he child's environment is injurious to his or her welfare; [or] ... (e) [t]he child is homeless, without proper care, or not domiciled with his or her parent, guardian, or legal custodian through no fault of such parent, guardian, or legal custodian." In this case, upon concluding that J.C.T. was not domiciled with a parent, and that neither the probate court nor the GAL could serve as an authorized legal guardian for J.C.T., the court of appeals held that these were "grounds to refer the matter to the juvenile court, which has the authority to assume jurisdiction and after an adjudicatory hearing, ... to determine whether [J.C.T.] is a neglected or dependent child...." *In re J.C.T.*, 155 P.3d at 456. Before discussing whether the probate court's actions divested it of jurisdiction and vested jurisdiction in the juvenile court, we first evaluate whether the court properly appointed itself as guardian, and the GAL as guardian designee, of J.C.T.

Following the guardianship hearing in March 2005, the probate court issued its order terminating Guardian 3's appointment as temporary substitute guardian, and stating, "[t]he court is taking Guardianship of [J.C.T.] temporarily and [the GAL] is appointed as the Guardian Designee." Moreover, the court explained that "[J.C.T.] will be temporarily staying with the Guardian ad Litem as he has in the past when necessary.[7] [J.C.T.'s] transfer to the Guardian ad Litem is part of the natural transition in this case." Then, in its April 2005 order denying Guardian 1's petition for guardianship, the court stated that it would "continue its guardianship of [J.C.T.] until the proposed adoptive family's guardianship petition [could] be heard." The court of appeals held that these actions by the probate court were in error.

Under the Colorado Probate Code, a "guardian" is defined as "an *individual* at least twenty-one years of age, resident or non-resident, who has qualified as a guardian of a minor or incapacitated person pursuant to appointment by a parent or by the court. The term includes a limited, emergency, and temporary substitute guardian but *not a guardian ad litem*." § 15–14–102(4), C.R.S. (2007) (emphasis added). Guardian 1 first argues that the probate court could not appoint itself as a guardian because the court is not an "individual." The GAL and the Tribes, however, ask this court to follow the statutory analysis set forth in *In re Estate of Morgan*, 160 P.3d 356 (Colo.App.2007). *Morgan* addressed a trial court order appointing the El Paso County Department of Human Services as the permanent guardian for an incapacitated ward. *Id.* at 357. In that case, the court of appeals held that the appointment was proper under the definition of "guardian" in section 15–14–102(4). We find its analysis in reaching that conclusion to be persuasive, and now apply its reasoning to the case at hand.

■ Although section 15–14–102(4) provides that a "guardian" means "an individu-

al," our reading of the guardianship provisions as a whole leads us to conclude that the probate court as a government entity may serve as a guardian. *See Morgan*, 160 P.3d at 358–59 (interpreting guardianship statutes and upholding the appointment of a government agency as the permanent guardian for an incapacitated ward). Section 15–14–310(1), C.R.S. (2007), requires the probate court in appointing a guardian to consider "persons otherwise qualified in the following order of priority" and then sets forth eight categories of "persons." Under section 15–14–310(3), the probate court, "for good cause shown, may decline to appoint a person having priority and appoint a person having a lower priority or no priority." As the *Morgan* court recognized, the legislature in these provisions used the word "person." *Morgan*, 160 P.3d at 359. Section 15–14–102(10) defines a "person" as "an individual, . . . government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity." The probate court therefore constitutes a "person" under the terms of the statute and thus, could appoint itself for good cause to serve as J.C.T.'s temporary guardian.

■ We also find that it was not improper for the court to appoint the GAL as "guardian designee." The term "guardian designee" does not appear in any provision of either the Probate Code or the Children's Code, nor can it be found in Colorado case law. In fact, our review of case law across the country reveals only one case in which the phrase "guardian-designee" was used: *In re Estate of Gustafson*, 308 A.D.2d 305, 764 N.Y.S.2d 46 (2003). The *Gustafson* court reversed a trial court's order, removing a relative as guardian of an incapacitated person and appointing an independent attorney as the new guardian. *Id.* at 308, 764 N.Y.S.2d 46. While the reversal was based on the specific facts in that case, as well as the strong preference in New York for appointing a relative as guardian, it is worth

---

7. J.C.T. spent thirteen days with the GAL and her family over the Thanksgiving holiday in 2004. Guardian 3 had arranged a vacation prior to becoming J.C.T.'s guardian. According to the GAL's Forthwith Motion in October 2005, J.C.T. stayed with the GAL because there was no one else with whom he was familiar who could care for him at the time. The GAL kept a journal of J.C.T.'s time with her.

noting that the court referred to the new guardian as the "guardian-designee." *Id.* at 307–09, 764 N.Y.S.2d 46. The court did not discuss this title in its opinion, but seemed to treat the independent attorney as any other "guardian" for purposes of its analysis. *See id.* Aside from this case, the term "guardian designee" only appears in two state statutes, both of which seem to deal with a situation, such as this, where a public agency is the guardian. *See* Md.Code Ann., Fam. Law. § 14–404(a)(1)(iii) (West 2007) (establishing a file review requirement for each guardianship that a public agency has held for more than a year, based on a report to the review board with information including the dates of most recent visits of the "guardian's designee"); Minn.Stat. Ann. § 524.5–313(c)(4)(v) (2007) (limiting liability of "guardian or the public guardian's designee" in providing necessary medical care to an incapacitated ward).

During oral argument in this case, the GAL maintained that in practice, in some guardianship cases in juvenile court, DHS is referred to as the child's guardian, with the department social worker being referenced as the "guardian designee." [8] The GAL explained that the social worker as guardian designee takes direction from the head of DHS, just as the GAL as guardian designee in this case took direction from the probate court. In addition, counsel for the Tribes speculated that the probate court in this case intended its guardianship to be very temporary, and possibly used the term "guardian designee" to describe the GAL as a sort of "placeholder" as opposed to a full guardian.

Despite this reasoning, the court of appeals rejected the appointment of the GAL as guardian designee as improper under the definition of "guardian" in section 15–14–102.

More specifically, the court of appeals relied on the last sentence of the "guardian" definition in section 15–14–102(4): "The term includes a limited, emergency, and temporary substitute guardian *but not a guardian ad litem.*" *See In re J.C.T.,* 155 P.3d at 456 (emphasis in original). The court interpreted this language to mean that a guardian ad litem could not also serve as a guardian. The Petitioners, however, contend that this sentence is merely intended to distinguish between the two roles, not to prohibit a dual appointment.

We agree that the sentence was simply meant to distinguish the role of a guardian from that of a guardian ad litem. The language specifically separates a guardian ad litem from types of probate guardianships provided by statute, specifically, limited, emergency, and temporary substitute guardians. *See* § 15–14–102(4).[9] Unlike these other listed positions, a guardian ad litem is not a type of guardianship under the Probate Code. He or she is not responsible for the minor ward's "support, care, education, health, and welfare," as if he or she were a parent to the minor. *See* § 15–14–208(1). Instead, the GAL has a separate and distinguishable role. Under the Probate Code, "a court may appoint a guardian ad litem if the court determines that representation of the interest otherwise would be inadequate." § 15–14–115, C.R.S. (2007). While a guard-

8. The GAL did not provide any supplementary materials with her brief to support this contention, and the DHS website does not actually include these terms in its discussion of its programs. Several public agencies in other states, however, seem to employ the terms in the manner described by the GAL. *See, e.g.,* Allegheny County Human Resources Development Commission's Guardianship Program, http://www.alleganyhrdc.org/guardianship.htm (last visited Nov. 28, 2007) (discussing role of "guardian/designee" when Allegheny County Area Agency of Aging serves as guardian of last resort for incapacitated individuals); Guardianship, Iowa Department of Human Services Employees' Manual, http://www.dhs.state.ia.us/p olicyanalysis/PolicyManualPages/Manual_Documents/Master/13–d.pdf (last visited Nov. 28,

2007) (discussing procedure when department assumes guardianship of children and citing language of typical court order transferring guardianship "to the Director of Human Services or designee"); Washoe County Public Guardian, http://www.washoecounty.us/guardian/Types. html (last visited Nov. 28, 2007) (describing procedures for appointment of Public Guardian's office as guardian and discussing requirements for "the Public Guardian or the Public Guardian's designee").

9. Section 15–14–304, C.R.S. (2007), discusses the appointment of a limited or unlimited guardian for an incapacitated person. Section 15–14–204(4)–(5), C.R.S. (2007), addresses both temporary and emergency guardians.

ian is "charged with the duty of taking care of [a ward]," it is the "universally acknowledged responsibility of guardians ad litem ... 'to represent the best interests' of children who are involved in litigation." Roy T. Stuckey, *Guardians Ad Litem as Surrogate Parents: Implications for Role Definition and Confidentiality*, 64 Fordham L.Rev. 1785, 1785–86 (1996) (discussing role of GAL) (citations omitted).

The wording of the "guardian" definition itself highlights the difference of these two roles by stating that the term "guardian" does not include the term "guardian ad litem." In order words, the two roles are not one and the same. The definitional language does not, however, prohibit a person from serving as both guardian and guardian ad litem to the same minor ward. By contrast, section 15–14–310(4) specifically excludes "[a]n owner, operator, or employee of a long-term-care provider from which the respondent is receiving care" from serving as a guardian "unless related to the respondent by blood, marriage, or adoption." Thus, if the legislature had intended to prevent guardians ad litem from serving as guardians, it surely could have established a similar exclusion; yet, it did not. We find, therefore, that the dual appointment of a person as guardian and guardian ad litem of a minor ward is not per se improper under the statute.

In rejecting the appointment of the GAL as guardian designee of J.C.T., the court of appeals also recognized, without any discussion, an inherent conflict of interest between the GAL and the child's guardian. *In re J.C.T.*, 155 P.3d at 456. While we acknowledge that there may be scenarios where an actual conflict of interest exists, thus preventing the dual appointment, we hold that there is no inherent conflict between the two positions.

As we consider the issue of inherent conflict, we seek guidance from both the Chief Justice Directive on appointments of child representatives, as well as the Colorado Rules of Professional Conduct. Chief Justice Directive 04–06 sets forth the authority and responsibilities of the Office of the Child's Representative, the duties of attorneys appointed as child's representatives, the duties of judges and magistrates in cases involving children, and the procedures for complaints and sanctions. *Court Appointments Through the Office of the Child's Representative*, Chief Justice Directive 04–06 (amended July 2006). Nothing in directive 04–06 indicates that it would be an inherent conflict of interest for a GAL to also serve as a child's legal guardian. Directive 04–06 does state, however, that an attorney appointed as a GAL "shall be subject to all of the rules and standards of the legal profession, including the additional responsibilities set forth by Colorado Rule of Professional Conduct 1.14." *Id.*

Colorado Rule of Professional Conduct 1.14 delineates a lawyer's ethical duties when dealing with a client under a disability, which includes minority. While the rule itself does not address temporary guardianships, the comment to Rule 1.14 explains that "[i]f the person [under a disability] has no guardian or legal representative, the lawyer must often act as a de facto guardian." By acknowledging the possibility that an attorney might assume two roles in dealing with a client under a disability, this comment suggests the lack of an inherent conflict of interest between the GAL role and the guardian role. Moreover, the ethical rules concerning conflicts of interest do not preclude the dual appointment. *See* Colo. Rules of Prof'l Conduct R. 1.7–1.9 (2007).

Asking this court to uphold the court of appeals' finding of a conflict of interest, Guardian 1 explains that the GAL, whose role is to look out for the best interests of J.C.T., was not in a position to evaluate herself and determine whether she would be a proper guardian for J.C.T. At first glance, ABA Formal Ethics Opinion 96–404 seems to support this conclusion. It "cautions that a lawyer ... should not act as or seek to have himself appointed guardian except in the most exigent of circumstances, that is, where immediate and irreparable harm will result from the slightest delay." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 96–404 (1996) (distinguishing between "seeking the appointment of a guardian for a client" and "seeking to be the guardian").

As an example of the latter situation, the Committee describes a lawyer needing to take action on behalf of his or her incapacitated client, who is about to be evicted, so as to prevent or delay the eviction. *Id.* While recognizing the need for immediate action in such a case, the Committee advises that the lawyer shall seek the appointment of an alternative formal guardian as soon as possible. *Id.*

The case at hand presented a similar need for immediate action by the GAL to prevent the irreparable harm to J.C.T. that could have resulted from delay. Despite Guardian 1's claims to the contrary, the exigent circumstance in this case was not that the potential adoptive family could be lost; rather, it was the lack of any ready and available guardian. The probate court determined that Guardian 3 was no longer an appropriate guardian for J.C.T., that Guardian 2 was not capable of caring for J.C.T., and that J.C.T.'s prior placement with Guardian 1 had not been successful. After seven years of probate court supervision with three different guardianship placements, the court recognized that J.C.T. would be irreparably harmed, mentally and emotionally, by being placed with yet another stranger. Thus, even under the ABA Committee's narrow exception to dual appointments provided in Formal Opinion 96–404, the probate court's appointment of the GAL as J.C.T.'s guardian designee was not improper.

In addition, the dual appointment in this case did not present an actual conflict of interest. Here, both the probate court and the GAL knew that their guardianship appointments would be temporary. In fact, in her order denying Guardian 1's guardianship petition, the probate court judge stated that the court's guardianship would continue only until the potential adoptive family's guardianship petition could be heard. The court did not appoint itself and the GAL without a time frame and only then start considering options for J.C.T. These appointments were made with this specific family in mind as a possible successor guardian. The court and the GAL intended to be placeholders, preserving J.C.T.'s status quo in the sense that he was already extensively familiar with the GAL. Guardian 1 correctly asserts that the temporary duration of a guardianship placement does not ameliorate any conflicts of interest. Here, however, the interests of the GAL as a guardian were in line with those of J.C.T. Both as a guardian and as a GAL, she was acting to further J.C.T.'s best interests. Moreover, she had no desire to serve as J.C.T.'s permanent guardian.[10] While an actual conflict of interest may exist in some scenarios and thus prevent a dual appointment, we find that no such conflict existed in this case.[11]

While the temporary guardianship appointments, both that of the probate court itself and of the GAL, were not ideal or even favored, the appointments were not prohibited by statute or rules of professional conduct. Both the probate court and the GAL were authorized to serve as J.C.T.'s temporary successor guardian. Because there was no period when J.C.T. was not domiciled with a guardian (or "guardian designee"), we conclude that J.C.T. was not a "neglected or dependent" child as defined by section 19–3–102(1)(e), and thus, not within the exclusive original jurisdiction of the juvenile court as

**10.** In support of her argument, Guardian 1 points to the court of appeals' questioning of the GAL's objectivity. In its opinion, the court recommended that upon certification of the case, the juvenile court consider removal of the current GAL, because "while the GAL is obviously concerned about the welfare of J.C.T., that concern has grown to the point where it has colored her judgment and may have caused her to lose the objectivity necessary to be an effective GAL on J.C.T.'s behalf." *In re J.C.T.*, 155 P.3d 452, 457 (Colo.App.2006). This concern does not necessary reflect on any potential conflict of interest between the GAL's role and that of a guardian. Because the appointment of a GAL is within the broad discretion of the probate court, we do not address the appropriateness of her continued appointment.

**11.** Petitioners argue that even if it were improper to appoint the GAL as guardian due to a conflict of interest between the two roles, the remedy was to appoint someone new as J.C.T.'s GAL, thus keeping the current GAL as J.C.T.'s temporary guardian. The appointment of a GAL is discretionary, and leaving J.C.T. without one would not render him neglected or dependent. Because we find that there was no inherent or actual conflict of interest here, we decline to address this scenario.

provided by section 19–1–104(1). We find that, in making these appointments, the probate court was properly exercising its jurisdiction over the administration of guardianships. *See* § 19–3–103(1)(f); § 15–10–302.

We also take issue with the argument that the probate court simply should have transferred the case to the juvenile court. While section 19–1–104(4)(b) provides that the probate court "may request the juvenile court to make recommendations pertaining to guardianship," it does not establish a means for a case transfer, particularly where the case merely involves the appointment of a successor guardian for a minor ward. The probate court is only required to certify questions of legal custody to the juvenile court where the juvenile court has a petition regarding the same child already pending or if the court has continuing jurisdiction over the child. § 19–1–104(4)(a). Because that was not the situation here, there was not a means by which the probate court could order the juvenile court to take the case.

Generally, the juvenile court process begins with a report of abuse or neglect, followed by a petition by the state claiming that a child is dependent or neglected. *L.L.*, 10 P.3d at 1275 (explaining the juvenile court process); *see also* § 19–3–501 (discussing the petition initiation and preliminary investigation in juvenile court proceedings). Once the juvenile court adjudicates the child dependent or neglected, the court has the jurisdiction to place the child with a guardian, with the county department of social services, or in a foster home, among other placements. *Id.* Here, as discussed above, we find that J.C.T. was not neglected or dependent at the time of the court's appointment of itself as guardian. We have no indication from the record whether DHS would seek involvement and ask the juvenile court to take further action. In her 1998 report to the probate court, the GAL explained that DHS refused to step in because a guardian was caring for J.C.T. and there was a forum in which the guardian, as well as J.C.T.'s mother, could seek court orders. This remains the case today.

In sum, we find that the probate court did not act improperly in appointing itself as temporary guardian of J.C.T., or in appointing the GAL as guardian designee. Further, the probate court has maintained its jurisdiction over J.C.T.'s guardianship.

## V. Conclusion

Today we hold that the probate court did not exceed its jurisdiction when it directed the GAL to find a permanent guardian for J.C.T. and considered the potential for an eventual adoption in evaluating J.C.T.'s best interests. These actions did not constitute a de facto adoption proceeding within the exclusive jurisdiction of the juvenile court. In addition, we conclude that the probate court's jurisdiction was not divested by its appointment of the GAL as temporary guardian for J.C.T. The administration of this guardianship proceeding remains within the authority of the probate court under section 19–3–103(1)(f), unless and until the juvenile court assumes jurisdiction. We therefore reverse the court of appeals' decision in *In re J.C.T.*, 155 P.3d 452, and we remand this case to the court of appeals with instructions to reinstate the order of the probate court.

