The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 1, 2019

**2019COA122**

**No. 18CA1655, *Actarus, LLC v. Johnson* — Probate — Persons Under Disability — Guardianship of Incapacitated Persons — Termination of or Change in Guardian's or Conservator's Appointment; Taxation — Property Tax — Redemption of Real Property of Person Under Disability**

A division of the court of appeals considers whether filing guardianship reports with the probate court is sufficient to constructively appoint a successor guardian pursuant to section 15-14-112(3), C.R.S. 2018.  The division concludes that merely filing such reports, without more, is insufficient.

Court of Appeals No. 18CA1655
Arapahoe County District Court No. 17CV32137
Honorable John L. Wheeler, Judge

Actarus, LLC,

Plaintiff-Appellant,

v.

Larnitta Darlene Johnson, by and through Bret Johnson, as next friend,

Defendant-Appellee.

ORDER AFFIRMED

Division I
Opinion by JUDGE GROVE
Taubman and Hawthorne, JJ., concur

Announced August 1, 2019

Hatch Ray Olsen Conant, LLC, Robert W. Hatch, II, Christopher J. Conant, Denver, Colorado, for Plaintiff-Appellant

Sparkman+Foote LLP, Kieran A. Lasater, Denver, Colorado; Pelz & Associates, P.C., Harlan P. Pelz, Denver, Colorado, for Defendant-Appellee

¶ 1     Plaintiff-appellant, Actarus, LLC, appeals the district court's

declaration that defendant-appellee, Larnitta Darlene Johnson, has

a statutory right of redemption to the property for which Actarus

holds a treasurer's deed.  Because Johnson was under a legal

disability and did not have a legal guardian when Actarus received

a treasurer's deed for the property from the Arapahoe County

Treasurer, we affirm.

## I.     Background

¶ 2     Johnson suffers from severe mental illness and has lived in an

assisted care facility since 1997.  Her husband, Robert Johnson,[1]

served as her court-appointed guardian until his death in 2012.

That same year, Johnson failed to pay property taxes on a house

that she owned.  The county placed a tax lien on the property and

then sold it.  Actarus bought the lien from its original buyer and,

when the lien went unredeemed, received a treasurer's deed from

the county in August 2017.

---

[1] Larnitta, her husband Robert, and her son Bret have the same
last name.  To avoid confusion, Larnitta is identified as "Johnson"
in this opinion.  Her husband and son are identified by first name.

¶ 3     Robert had not filed his annual guardian's report before his death, and so, beginning in March 2012, the probate court issued a series of delay prevention notices requesting updates on the guardianship as well as on Johnson's status. The first of these was addressed to Robert, but after an unknown person filed Robert's certificate of death with the Arapahoe County probate court, subsequent notices were addressed to the other members of Johnson's family.

¶ 4     No one responded to the delay prevention notices until February 2013, when Johnson's son Bret, apparently having learned of at least one of them, mailed a "Guardian's Report – Adult" to the court. Using a court-approved form, Bret listed his name and contact information in the section entitled "guardian information," wrote "this is the first report for the new guardian," and checked a box indicating that he wished to "remain guardian." He also provided information about Johnson's health, activities, finances, and living conditions.

¶ 5     Even though it had received notice that Robert — Johnson's initial court-appointed guardian — had died, and notwithstanding Bret's representation in the report that he was "the new guardian,"

the probate court took no action to formally appoint Bret or anyone else as Johnson's guardian. In fact, the probate court did nothing for nearly three years, when, in early 2016, it issued another delay prevention order — this time addressed to Bret — ordering him to file the guardian's report for 2015 no later than February 4, 2016. Although Bret had never been formally appointed as Johnson's guardian, the order included a bold "X" by the stock language, "[t]he Letters of Guardianship/Conservatorship that authorize you to act will be suspended if the document(s) remain delinquent."

¶ 6 Bret filed a second guardian's report, again identifying himself as Johnson's guardian and indicating a desire to remain guardian. The pattern then repeated itself the next year. Each of Bret's reports was handwritten on the standard court-prescribed form, which included a verification that it was being filed under penalty of perjury.

¶ 7 Meanwhile, the clock was running on the tax lien that the Treasurer had sold in 2013. The lien went unredeemed, and, on August 15, 2017, the Treasurer issued a treasurer's deed to Actarus, which promptly recorded it.

¶ 8     After the treasurer's deed was issued, Bret formally petitioned the probate court to be appointed Johnson's conservator and for his sister to be appointed guardian.  Actarus then filed this quiet title action seeking a declaration that it was the sole legal owner of Johnson's home.  Johnson (acting through Bret with the district court's approval) filed cross-claims against the Treasurer, for allegedly failing to comply with statutory notice and due diligence requirements, and counterclaims against Actarus, asserting that Johnson had a statutory right to redeem her interest in the property due to her legal disability.

¶ 9     Actarus moved for partial summary judgment, asking the court to "decree[] that Ms. Johnson has no right of redemption under C.R.S. § 39-12-104[, C.R.S. 2018]."  The Treasurer also moved for summary judgment, arguing that the undisputed facts established that the treasurer's deed had been validly issued.  The district court granted the Treasurer's motion but denied summary judgment for Actarus after concluding that Johnson was under a legal disability — and was without a guardian — when the treasurer's deed was issued.  As a result, the court concluded, section 39-12-104 applied to extend Johnson's redemption period

by nine years beyond the date on which Actarus recorded the treasurer's deed.

¶ 10    Actarus appeals the district court's order denying its motion for summary judgment and declaration that Johnson has a right of redemption.[2]

## II.    Analysis

### A.    Standard of Review

¶ 11    The district court ruled as a matter of law, basing its conclusions on its interpretation of the probate and tax codes.  We review de novo questions of statutory interpretation.  *Stamp v. Vail Corp.*, 172 P.3d 437, 442 (Colo. 2007).

### B.    The Right of Redemption

¶ 12    A homeowner who fails to pay property taxes risks losing her property through a treasurer's deed.[3]  §§ 39-11-101 to -109, C.R.S.

---

[2] On May 29, 2019, the parties presented oral arguments to this court.  On May 30, 2019, this court stayed the appellate proceedings until the parties could demonstrate that the district court had entered a final, appealable order.  On June 27, 2019, the district court issued a certification of final judgment pursuant to C.R.C.P. 54(b).

[3] The governing statutes use the phrases "treasurer's deed" and "tax deed" interchangeably.  *See, e.g.,* § 39-11-129, C.R.S. 2018 ("treasurer's deed"); § 39-11-134, C.R.S. 2018 ("tax deed").  Most

2018.  When taxes go unpaid, the county "may sell a tax lien on the property to a third party."  *Red Flower, Inc. v. McKown*, 2016 COA 160, ¶ 1.  If the owner does not redeem the lien by paying the outstanding taxes and interest within three years of its issuance, "the holder of an unredeemed lien may obtain a treasurer's deed for the property."  *Id.*

¶ 13     Typically, a treasurer's deed "terminate[s] the taxpayer's entire ownership interest in the subject property by conveying the totality of the land on which the taxes are delinquent."  *Bolser v. Bd. of Comm'rs*, 100 P.3d 51, 54 (Colo. App. 2004).  It does so by "convey[ing] a paramount title, wiping out any other interest in the property."  *Meyer v. Haskett*, 251 P.3d 1287, 1291 (Colo. App. 2010).

¶ 14     There are, however, some exceptions.  For example, a treasurer's deed is void "when the taxing entity lacked the authority or jurisdiction to issue it" and is voidable when it "is issued with authority but where that authority is exercised in an improper

---

cases from this court use the phrase "treasurer's deed," and we will do likewise except where quoting statutory language that refers to a "tax deed."

manner." *Lake Canal Reservoir Co. v. Beethe*, 227 P.3d 882, 889 (Colo. 2010). Both void and voidable deeds may be set aside by a court when challenged as part of an action to quiet title. *See Sandstrom v. Solen*, 2016 COA 29, ¶ 42.

¶ 15 Even validly issued treasurer's deeds can be set aside in some situations. As relevant here, a property owner who is "under legal disability at the time of execution and delivery of a tax deed . . . shall have the right to make redemption of such property at any time within nine years from the date of the recording of such tax deed." § 39-12-104(1). Thus, while a homeowner's legal disability will not prevent the placement of a tax lien, the sale of that lien, or the subsequent issuance of a treasurer's deed, the recordation of that deed does not extinguish a qualifying homeowner's right to redeem the property.

¶ 16 It is undisputed that Johnson is incapacitated and needs a court-appointed guardian to look after her interests. The parties likewise appear to agree that if Johnson had had such a guardian at the time that the treasurer's deed was issued, then she was not "under legal disability" as contemplated by section 39-12-104(1). As we explain below, Johnson's "legal disability" (or lack thereof)

turns on whether Bret became her guardian once he began filing guardianship reports with the probate court.  We conclude that Bret's submission of these reports did not, without more, serve to install him as Johnson's guardian.  Thus, Johnson was under a legal disability when the treasurer's deed was issued, and she accordingly had nine years to exercise her right of redemption following recordation of the treasurer's deed.

## C.    Legal Disability and Guardianship

¶ 17    The statutes outlining the right of redemption do not define the phrase "under legal disability," *see* §§ 39-12-101 to -113, C.R.S. 2018, and its plain and ordinary meaning is capable of alternative reasonable interpretations.  As a result, we may rely on canons of statutory construction, "including legislative history, the language of laws on the same or similar subjects, and the placement of a provision within the statutory framework," to divine the General Assembly's intent.  *Associated Gov'ts of Nw. Colo. v. Colo. Pub. Utils. Comm'n*, 2012 CO 28, ¶ 11; *see also* 2B Norman Singer & Shambie Singer, *Sutherland Statutory Construction* § 51:2, Westlaw (7th ed. database updated Nov. 2018).  Here, because they share the goal of ensuring that incapacitated individuals will not be deprived of an

opportunity to assert their rights, we look to Colorado's statutes of limitation, which have special provisions for "person[s] under disability," to assist our interpretation. § 13-81-101, C.R.S. 2018.

¶ 18    One of Colorado's limitations statutes defines a "[p]erson under disability" as "any person who is a minor under eighteen years of age, a mental incompetent, or a person under other legal disability and who does not have a legal guardian." § 13-81-101(3). Similarly, in the general limitations statute for child victims of sexual assault, a "person under disability" means "any person who is a minor under eighteen years of age, a person who has been declared mentally incompetent, or a person under other legal disability and who does not have a legal guardian." § 13-80-103.7(3.5)(a), C.R.S. 2018.  In *Elgin v. Bartlett*, 994 P.2d 411, 414 (Colo. 1999), the Colorado Supreme Court determined the meaning of "person under disability" pursuant to section 13-81-101 and recognized that

> [a] person under disability, for whom the court has not appointed a legal representative, is protected by the statute of limitations' tolling provisions.  *See* § 13-81-103(1)(c), 5 C.R.S. (1999).  The statute of limitations begins to run when the minor reaches the age of eighteen or when, if it does, a court appoints a

> legal representative for the minor.  Court appointment of the legal representative averts the minor's legal disability for purposes of litigating the minor's rights, thereby rendering inapplicable the tolling provisions.  *See* § 13-81-103(1)(a), 5 C.R.S. (1999).  The statute defines a "legal representative" as "a guardian, conservator, personal representative, executor, or administrator *duly appointed by a court having jurisdiction of any person under disability* or his estate." § 13-81-101(2).

(Emphasis added.)

¶ 19    Considering the similar statutory tolling provisions, and in light of the holding in *Elgin*, 994 P.2d at 414-15, we conclude that, for the purposes of section 38-12-104(1), an "owner of real property" who "is under legal disability" includes an individual who a court has determined is incapacitated and who does not have a legal guardian who can advocate on her behalf.

¶ 20    Actarus asserts that Johnson is not entitled to a right of redemption because Bret, although never formally appointed by the court, was nonetheless Johnson's "admitted guardian."  Because Johnson had a guardian, Actarus contends, she did not have a "legal disability" and was not entitled to a nine-year redemption period.  Actarus offers three arguments in support of its position: (1) Bret was appointed as successor guardian pursuant to section

10

15-14-112(3), C.R.S. 2018; (2) Bret was a "de facto guardian"; and (3) Johnson is estopped from denying Bret's status as guardian due to statements that Bret made in the guardian reports that he periodically filed with the district court. We address each contention in turn.

### 1.     Successor Guardian

¶ 21     The parties agree that Johnson's *guardianship* continued to exist when the treasurer's deed was issued — despite Robert's death — because Johnson is alive and the probate court never issued a termination order. *See* § 15-14-301, C.R.S. 2018 ("A person becomes a guardian of an incapacitated person upon appointment by the court. The guardianship continues until terminated, without regard to the location of the guardian or ward."). The parties disagree, however, as to whether the *office* of guardian was vacant when the treasurer's deed was issued.

¶ 22     The district court determined that the office was vacant (that is, that Bret was not Johnson's guardian) because, after Robert's death, Bret and the probate court did not follow the statutory procedures for the appointment of a successor guardian. The district court acknowledged that Bret periodically responded to the

11

probate court's requests for the submission of the annual guardian's report for Johnson, and it further acknowledged that Bret identified himself as "the new guardian" for Johnson beginning in early 2013. But "treat[ing] [Bret] as a guardian," the district court concluded, is not the same thing as "*order[ing]* Bret's appointment as guardian." In other words, the district court found that the probate court's "administrative oversight" did not result in Bret's assumption of Johnson's guardianship by acquiescence.

¶ 23    Actarus contends that the district court erred in reaching this conclusion because the procedural formalities required for the creation of a guardianship and the appointment of an initial guardian do not apply to successor guardians. Instead, Actarus asserts that the delay prevention orders, together with Bret's responses to them, effectively appointed Bret as Johnson's successor guardian. We disagree.

¶ 24    Section 15-14-112(3) governs the appointment of a successor guardian and states as follows:

> The court may appoint an additional guardian
> . . . at any time, to serve immediately or upon
> some other designated event, and may appoint
> a successor guardian . . . in the event of a
> vacancy or make the appointment in

contemplation of a vacancy, to serve if a vacancy occurs. An additional or successor guardian . . . may file an acceptance of appointment at any time after the appointment, but not later than thirty days after the occurrence of the vacancy or other designated event. The additional or successor guardian . . . becomes eligible to act on the occurrence of the vacancy or designated event, or the filing of the acceptance of appointment, whichever occurs last.

¶ 25     Subsection (3) thus provides that a successor guardian takes office only after a court appoints him and he has accepted the appointment. But it does not establish specific procedures for either of these steps. To resolve the questions raised by Actarus in this case, we need only consider whether Bret accepted the "appointment" that Actarus claims was effectuated by the probate court's delay prevention orders. Because Bret did not accept, we hold that he did not become Johnson's guardian.

¶ 26     In general, a person appointed by a court to be a guardian must accept his appointment before he is eligible to act. *See In re Estate of Morgan*, 160 P.3d 356, 359 (Colo. App. 2007) (court lacked statutory authority to appoint guardian when nominee did not file an acceptance of office). Acceptance is completed by filing a signed and verified "acceptance of office" with the court that includes,

13

among other things, a criminal background check, information about civil judgments and civil protection orders, and a credit report. § 15-14-110(1), C.R.S. 2018.[4]

¶ 27    While section 15-14-112(3), which governs the appointment of a successor guardian, also requires an appointee to file an "acceptance of appointment" before acting as guardian, it does not outline procedures for accepting the appointment. But the need to ensure that the successor guardian will faithfully discharge his responsibilities to the ward is just as great. *See Arguello v. Balsick*, 2019 COA 20M, ¶ 23 ("The purpose of guardianship is to protect and assist incapacitated persons; however, because a guardian constitutes a restriction on an incapacitated person's liberty or access to property, guardianship proceedings implicate and require due process of law."). Because the paramount concern of a guardianship remains the well-being of the ward, we see no reason to deviate from statutory procedures intended to satisfy that

---

[4] Some nominees, including public administrators and parents, are exempted from attaching this additional information to the form accepting appointment. § 15-14-110(4), C.R.S. 2018. Upon a showing of good cause, a court may also waive the requirements that a nominee submit these documents. § 15-14-110(4)(g).

14

requirement when considering the appointment of a successor guardian.[5]

¶ 28     For these reasons, we reject Actarus' argument that Bret accepted appointment as guardian by filing the guardian reports and subjecting himself to the probate court's jurisdiction.  In support of this argument, Actarus cites *Morgan*, 160 P.3d at 359, for the proposition that an "acceptance of appointment" is merely a filing by the guardian whereby the guardian consents to the personal jurisdiction of the probate court.  But *Morgan* never reached that question.  Rather, the division considered only whether the probate court could appoint an unwillingly nominated guardian (in that case, the El Paso County Department of Human Services) over the nominee's objection.  Because the nominee "objected to the appointment, did not consent to it, and, thus, did not accept it," the division did not have occasion to consider what steps would have been necessary to formalize the appointment.  *Id.*

---

[5] We note that JDF 805, the court-prescribed form for a guardian's acceptance of office, implicitly follows the same approach by making clear that any nominee, including an emergency or temporary guardian, must provide extensive background information to the probate court in order to finalize the appointment.

15

¶ 29    We hold that the requirement that a person nominated to be guardian file an "acceptance of appointment" is not satisfied by filing guardian reports.  Before acting as a successor guardian, a nominee must file an "acceptance of office" and submit to the court any and all associated information required by the statute.  § 15-14-110(1).  The court, in turn, must review and approve that information and issue letters of guardianship that define the scope of the guardian's authority and authorize the guardian to act.  Because Bret did not submit this information, letters of guardianship were never issued, and he was never authorized to act as Johnson's guardian.

## 2.    De Facto Guardian

¶ 30    Actarus nevertheless asserts that in situations where a guardianship is created, but no guardian is appointed, a person who acts as a legal guardian becomes a "de facto guardian" subject to all the responsibilities that attach to a court-appointed guardian.

¶ 31    The district court rejected this argument and explained that "the Court cannot consider Bret a de facto guardian under the common law.  Any common law powers of appointment the probate court may have had were displaced by the provisions in the Probate

16

Code governing appointment. *See Beren v. Beren,* 2015 CO 29,

¶ 29."

¶ 32    Actarus contends that this was error because the probate code

does not contain any specific procedural or substantive provisions

for dealing with a vacancy in the office of guardian, and the

common law "fills the gap."

¶ 33    Although the death of a guardian terminates the guardian's

appointment, it does not terminate the guardianship. *See* § 15-14-

112(1).  Instead, the guardianship of an incapacitated adult

terminates only upon the death of the ward or upon an order of the

court.  §§ 15-14-301, -318(1).  This creates the possibility of a

vacancy in the office of guardian while the guardianship continues.

¶ 34    The probate code accounts for this situation by permitting the

probate court to appoint a successor guardian "in the event of a

vacancy or . . . in contemplation of a vacancy, to serve if a vacancy

occurs." § 15-14-112(3).  By establishing procedures for filling a

vacancy in the office of guardian, the probate code displaced the

common law to the extent that it would allow for the recognition of

a "de facto guardian" under the circumstances here. *See* § 15-10-103, C.R.S. 2018.[6]

### 3. Judicial Admissions

¶ 35 Actarus asserts that the district court erred in disregarding Bret's "judicial admissions" that Johnson was under the protection of her court-appointed guardian. We disagree.

¶ 36 Actarus relies primarily on *Holiday Acres Property Owners Ass'n, Inc. v. Wise*, 998 P.2d 1106, 1110 (Colo. App. 2000), for the proposition that a party's statements and admissions concerning its legal status are facts subject to the doctrine of judicial admissions. In *Wise,* a division of this court held that a party's averments in responses to interrogatories and in other evidence that it was a common interest ownership community constituted judicial

---

[6] An exhaustive search reveals only a single Colorado case that uses the phrase "de facto guardian." *In re J.C.T.,* 176 P.3d 726, 735 (Colo. 2007). In *J.C.T.,* the supreme court discussed Colo. RPC 1.14 as it stood when the case was published, noting that the comment to that rule stated that "[i]f the person [under a disability] has no guardian or legal representative, the lawyer must often act as a de facto guardian." *Id.* The version of the rule cited in *J.C.T.* was effective until January 1, 2008, when the entire rule was repealed and reenacted with amendments that did not change its scope. The comments to the current version of the rule no longer include a reference to a "de facto guardian."

admissions. However, the doctrine of judicial admission "has been applied in very limited contexts," none of which are present here. *People v. McKimmy*, 2014 CO 76, ¶ 17 (quoting *People v. Curren*, 228 P.3d 253, 257 (Colo. App. 2009)). Furthermore, there is no indication that *Wise* extends beyond its narrow holding.

¶ 37    "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo. 1986). It is a doctrine that relates to proof of facts. It "does not apply to propositions of law." *Miller v. Brannon*, 207 P.3d 923, 929 (Colo. App. 2009).

¶ 38    Actarus identifies as "judicial admissions" statements that Bret made in guardian's reports that he filed in the probate court, as well as statements appearing in the motion to substitute parties that Johnson's attorney filed in the district court. But as we have already discussed, whether Bret succeeded his father as guardian, and, if so, at what point his succession was effective, turns on whether his putative appointment complied with section 15-14-112(3). That presents a question of law, not of fact. *See McKimmy*,

¶ 17 (judicial admissions apply to facts, not legal consequences of those facts). The district court therefore correctly declined to treat statements by Bret and by Johnson's attorney as judicial admissions.

## III. Attorney Fees

¶ 39 Johnson requests attorney fees and double costs pursuant to C.A.R. 38(b) and section 13-17-102(4), C.R.S. 2018. Although Actarus did not succeed in this appeal, it advanced cogent and well-supported arguments. *See Mission Denver Co. v. Pierson*, 674 P.2d 363, 365 (Colo. 1984) ("Standards for determining whether an appeal is frivolous should be directed toward penalizing egregious conduct without deterring a lawyer from vigorously asserting his client's rights."); *see also Janicek v. Obsideo, LLC*, 271 P.3d 1133, 1140 (Colo. App. 2011) ("[A] claim is not frivolous 'if it is meritorious but merely unsuccessful[.]'" (quoting *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 299 (Colo. App. 2009))). We therefore decline to award fees to Johnson.

## IV. Conclusion

¶ 40 We affirm the district court's order and deny Johnson's request for attorney fees and costs.

JUDGE TAUBMAN and JUDGE HAWTHORNE concur.