The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 4, 2026

**2026 COA 47**

**No. 25CA1563, *People in Interest of C.N.T.* — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship — Guardian ad Litem — Standing**

In this dependency and neglect appeal, a division of the court of appeals considers whether a guardian ad litem (GAL) has standing to file a motion to terminate parental rights. The division concludes that a GAL has standing because (1) *People in Interest of R.M.P.*, 2025 CO 34, applies only to the first, or adjudicatory, phase of a dependency or neglect proceeding and not to the second, or dispositional, phase of a dependency or neglect proceeding; and (2) the GAL is acting under their independent statutory charge to advocate for the child's best interests.

The division further rejects the parents' contentions that the juvenile court erred by (1) terminating their parental rights; (2) finding that the Department made reasonable efforts to

rehabilitate them and to reunite them with the child; (3) finding that the father was unfit and that the mother couldn't become fit within a reasonable time; and (4) finding there was no less drastic alternative to termination.

Likewise, the division is unpersuaded by the father's additional claims that (1) his treatment plan was inappropriate; (2) he substantially complied with his treatment plan; and (3) his counsel provided ineffective assistance.

The division affirms the juvenile court's judgment.

Court of Appeals No. 25CA1563
Chaffee County District Court No. 23JV30009
Honorable Dayna Vise, Judge

The People of the State of Colorado,

Appellee,

In the Interest of C.N.T., a Child,

and Concerning W.C.T. and N.L.D.,

Appellants.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE MEIRINK
Lum, J., concurs
J. Jones, J., concurs dubitante

Announced June 4, 2026

Mannina & Associates, Julie Thomerson, Denver, Colorado, for Appellee

Jenna L. Mazzucca, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant W.C.T.

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant N.L.D.

¶ 1  W.C.T. (father) and N.L.D. (mother) appeal the juvenile court's judgment terminating their parent-child legal relationships with C.N.T. (the child). The parents contend, in part, that under *People in Interest of R.M.P.*, 2025 CO 34, ¶ 33, which held that the State is the exclusive party to prosecute a dependency or neglect proceeding, the guardian ad litem (GAL) lacked standing to file a motion to terminate their parental rights. Thus, they argue, the juvenile court lacked subject matter jurisdiction to terminate their parental rights. We disagree and conclude that *R.M.P.* doesn't apply for two reasons: (1) *R.M.P.* applies to only the adjudicatory (first) phase of a dependency or neglect proceeding — and the motion to terminate was filed in the dispositional (second) phase of the proceeding — and (2) the GAL was acting under section 19-3-203(5), C.R.S. 2025, which charges a GAL to represent the child's best interests. We affirm.

## I. Background

¶ 2  In September 2023, the Chaffee County Department of Human Services received a report that mother had been involved in a domestic violence incident and that she was too intoxicated to care for the child. A caseworker responded to the scene and spoke with

1

mother, who explained that father had custody of the child but that he was currently incarcerated in the county jail.  The Department removed the child and filed a petition in dependency or neglect.

¶ 3     The parents admitted that the child was in an injurious environment, and the juvenile court adjudicated the child dependent and neglected.  After a dispositional hearing, the court adopted treatment plans for the parents that required them to address substance use and domestic violence, improve their parenting skills, attend family time, and provide a safe and stable home.

¶ 4     In February 2025, the GAL moved to terminate the parents' parental rights; the Department didn't object.  The juvenile court held an evidentiary hearing in June 2025; the GAL and the Department participated.  After considering the evidence, the court granted the GAL's motion and terminated mother's and father's parent-child legal relationships with the child.

## II.    Standing

¶ 5     The parents assert that the juvenile court lacked subject matter jurisdiction to terminate their parental rights because the GAL didn't have standing to move for termination.  We disagree.

2

¶ 6    Whether a party has standing is a legal question that we review de novo.  *R.M.P.*, ¶ 18.  In *R.M.P.*, ¶ 33, the supreme court determined that, under the State's *parens patriae* authority,[1] only the State has standing to bring an action in dependency or neglect and to prosecute a petition in dependency or neglect.  In doing so, the supreme court overruled *People in Interest of R.E.*, 729 P.2d 1032 (Colo. App. 1986), which allowed a juvenile court to maintain a dependency or neglect case over the department's request to dismiss the petition before an adjudicatory hearing had occurred when the GAL objected to dismissal.

¶ 7    The parents maintain that, in light of the supreme court's holding in *R.M.P.*, a GAL lacks standing to file a motion for termination and is therefore no longer permitted to do so.  We disagree and conclude that *R.M.P.* doesn't lead to the conclusion that a GAL lacks standing to move for termination.

¶ 8    To begin, we recognize that in *R.M.P.* the supreme court used the word "proceeding" on a few occasions when describing the

---

[1] *Parens patriae* is "[a] doctrine by which a government has standing to prosecute a lawsuit on behalf of a citizen, [especially] on behalf of someone who is under a legal disability to prosecute the suit." Black's Law Dictionary 1336 (12th ed. 2024).

State's role in prosecuting a dependency or neglect petition. *R.M.P.*, ¶¶ 4, 24, 33. But we disagree with the parents that these few references to a "proceeding" evidence the supreme court's intent to prohibit a GAL from filing a motion to terminate. There is no doubt that termination is part of an overall dependency or neglect proceeding in a general sense. *See People in Interest of S.A.G.*, 2021 CO 38, ¶ 39 n.3 (noting that a motion to terminate parental rights is "not the start of a second proceeding"). Yet for the reasons set forth below, we aren't convinced that the supreme court intended for *R.M.P.* to apply so broadly that a GAL could never ask for any relief during a dependency or neglect proceeding.

¶ 9     Reading *R.M.P.* in context, we conclude that the opinion only applies to the first phase of a dependency or neglect proceeding. A dependency or neglect proceeding has two phases:

> (1)   In the first, or adjudicatory, phase, the State, through the department of human services, files a petition, and the juvenile court must "determine[] if there are grounds to adjudicate the child dependent and neglected." *E.O. v. People in Interest of C.O.A.*, 854 P.2d 797, 800 (Colo. 1993).

4

(2)     If the juvenile court adjudicates a child dependent or neglected, "the second, or dispositional, phase commences with the hearing and adoption of a treatment plan." *Id.* During the second phase, the court may consider a motion to terminate parental rights if the treatment plan is unsuccessful in rehabilitating the parent. *See* § 19-3-602(1), C.R.S. 2025.

¶ 10     In *R.M.P.*, the supreme court noted that the *parens patriae* doctrine provides the State with standing to initially intervene in the familial relationship. *R.M.P.*, ¶ 20. The State exercises this authority by filing a petition in dependency or neglect, thus beginning the first phase of a dependency or neglect proceeding. And because the State is the sole party that can initiate a dependency or neglect proceeding by filing a petition, it is also the only entity with standing to prosecute that petition. *Id.* at ¶ 22. In *R.M.P.*, the supreme court clarified that, in a dependency or neglect proceeding, the generic term "prosecute" means to "institute" or to "pursue" the legal proceeding. *Id.* at ¶ 3 n.1. Likewise, the State is the only party that has a "legal interest in determining whether a child should be adjudicated dependent or neglected." *Id.* at ¶ 23.

*R.M.P.* therefore addresses only the State's authority to (1) initiate a case and (2) prosecute the petition to its conclusion — a dependency or neglect adjudication.

¶ 11    While the stare decisis doctrine requires courts to adhere to earlier judicial decisions from a higher court when the same issue arises again in litigation, *People v. Kembel*, 2023 CO 5, ¶ 43, the precedential value of a decision is strictly limited to the issues that were actually raised and resolved, *see Gomez v. Walker*, 2023 COA 79, ¶ 9 (recognizing that a prior appellate decision isn't controlling unless it decided the specific issue presently on appeal); *Coon v. Berger*, 588 P.2d 386, 387 (Colo. App. 1978) (A "prior opinion is only [s]tare decisis on the point decided [therein].").  Therefore, although the supreme court referred to a dependency or neglect "proceeding" broadly, we conclude that its holding relates to the

initiation of a dependency or neglect case only until a child is adjudicated as dependent or neglected.[2]

¶ 12    *R.M.P.* says nothing about whether, after an adjudication is entered, a GAL can file a motion to terminate.  Notably, unlike a petition in dependency or neglect, which commences the action, a motion for termination is merely a request for a remedy within the case.  *See S.A.G.,* ¶ 39 n.3 ("[A] motion to terminate parental rights after a child has been adjudicated dependent and neglected is a request for a remedy . . . .").  Indeed, the supreme court has recognized that a GAL has authority to file a motion for termination.  *See, e.g., C.W.B. v. A.S.,* 2018 CO 8, ¶ 24 ("[T]he GAL may file a motion to terminate the parent-child legal relationship."); *A.M. v. A.C.,* 2013 CO 16, ¶ 14 ("Failure to comply reasonably with the treatment plan may provide grounds for the State *or the guardian*

---

[2] In *People in Interest of N.K.S.*, the majority relied on *People in Interest of R.M.P.*, 2025 CO 34, ¶ 4, to hold that the GAL lacked standing to appeal the denial of a motion to terminate parental rights, whether acting on the State's behalf or in the GAL's own right.  *N.K.S.*, 2025 COA 100, ¶ 5 (*cert. granted* Mar. 30, 2026).  To the extent that *N.K.S.* can be read to suggest that a GAL can't file any motion of substance, such as a motion to terminate parental rights, we disagree with the majority's holding.  *See Chavez v. Chavez*, 2020 COA 70, ¶ 13 (recognizing that one division of the court of appeals isn't bound by the decisions of another division).

*ad litem* to file a motion to terminate parental rights." (emphasis added)); *People in Interest of M.N.*, 950 P.2d 674, 676 (Colo. App. 1997) (holding that a GAL may file a motion to terminate parental rights and that the juvenile court did not err by terminating father's parent-child legal relationship with his children on the GAL's motion).

¶ 13     Moreover, "the GAL is statutorily obligated to advocate for the best interests of the child and is expressly authorized to participate at all steps of the legal proceedings." *C.W.B.*, ¶ 24. Specifically, section 19-3-203(5) requires a GAL to "participate further in the proceedings to the degree necessary to adequately represent the child."[3] While the statute doesn't "specify[] the precise method that should be utilized in performing the role," *People in Interest of D.L.C.*, 70 P.3d 584, 586 (Colo. App. 2003), section (V)(D)(1)(a)(i) of Chief Justice Directive (CJD) 04-06, Court Appointments Through

---

[3] The General Assembly recently passed House Bill 26-1227, which was enacted in direct response to *People in Interest of R.M.P.*, 2025 CO 34, to clarify that as a party to the proceedings, the child has legal standing regarding all matters related to the child's interests and the right to have those interests fully represented by the GAL throughout the proceedings, including appeals. H.B. 1227, 75th Gen. Assemb., 2d Reg. Sess. (Colo. 2026).

the Office of the Child's Representative (amended Jan. 2023), requires a GAL to, at a minimum, "[p]resent independent information relevant to the child's best interests at each hearing through . . . motions . . . and other acceptable means consistent with the court's appointment orders and the GAL's statutory authority and ethical obligations." *See Off. of State Ct. Adm'r v. Background Info. Servs., Inc.*, 994 P.2d 420, 431 (Colo. 1999) ("The Chief Justice Directive represents an expression of Judicial Branch policy, to be given full force and effect in matters of court administration."); *see also People v. Greer*, 2022 CO 5, ¶ 27 ("The enforceability of CJDs is beyond question.").

¶ 14      For the reasons explained, *R.M.P.* doesn't apply to this matter. The case had progressed past the adjudicatory phase of the proceeding. And the GAL was complying with the independent and "universally acknowledged responsibility of [a GAL] . . . 'to represent the best interests' of children who are involved in litigation." *In re J.C.T.*, 176 P.3d 726, 735 (Colo. 2007) (citation omitted).

¶ 15      Accordingly, the GAL had authority to file the motion to terminate.

### III. Venue

¶ 16     Father contends that the juvenile court erred by failing to change venue to Saguache County. Father moved for a change of venue in the juvenile court but withdrew the motion because "he did not want to pursue" it. Therefore, father abandoned this argument, and we decline to address it. *See In re Marriage of Corak*, 2014 COA 147, ¶ 23 ("A litigant who abandons an argument in the trial court likewise abandons it for the purposes of appeal.").

### IV. Termination of Parental Rights

¶ 17     The parents argue that the juvenile court erred by terminating their parental rights. We aren't persuaded.

#### A. Termination Criteria and Standard of Review

¶ 18     A juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 19    Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves an application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 20    The credibility of the witnesses; the sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). We therefore cannot reweigh the evidence or substitute our judgment for that of the juvenile court. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.

### B.    Appropriate Treatment Plan

¶ 21    Father asserts that his treatment plan was inappropriate. We discern no error.

¶ 22    A treatment plan is appropriate if (1) it is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time, and (2) it relates to the child's

11

needs. § 19-1-103(12), C.R.S. 2025. An appropriate treatment plan must "address the safety concerns identified during the assessment of the family." *People in Interest of K.B.*, 2016 COA 21, ¶ 14. We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, "which must be assessed in light of the facts existing at the time of the plan's approval." *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005).

¶ 23  While the focus of a plan is to address the child's needs and any identified safety concerns, the plan's requirements must also be realistic given the existing facts. *See People in Interest of B.J.D.*, 626 P.2d 727, 730 (Colo. App. 1981). When the requirements of a treatment plan are not realistic based on the existing facts, "[n]on-compliance [is] virtually assured and lack of success [is] a foregone conclusion." *Id.*

¶ 24  The juvenile court found that father's treatment plan was appropriate because it "adequately addressed the safety concerns which initiated the Department's involvement — namely, substance use and patterns of domestic violence." The record supports the court's finding. For example, father's treatment plan included a substance use component that required him to complete a

substance use evaluation and follow any recommendations from the provider, develop a relapse prevention plan, and participate in random drug tests. Likewise, the treatment plan included a domestic violence component that required father to complete a domestic violence evaluation, identify triggers and coping mechanisms, and learn how domestic violence impacted the child.

¶ 25    Still, father asserts that the treatment plan was inappropriate because it didn't consider the various barriers he had to completing the plan, such as "transportation, employment, location, and ability to pay for treatment." He maintains that, because the treatment plan was unrealistic given these facts, the plan was destined for failure. Although the evidence shows that there were barriers to father completing parts of his treatment plan, we aren't convinced that those barriers rendered the treatment plan inappropriate. Rather, as discussed *infra* Part IV.D below, the Department attempted to provide father with ways to overcome those barriers. Had father fully engaged with available services and taken advantage of the Department's efforts, he could likely have successfully completed the treatment plan. We therefore reject father's assertion.

## C.    Treatment Plan Compliance

¶ 26    Father also asserts that he substantially complied with his treatment plan and that the juvenile court therefore erred by terminating his parental rights.  We aren't persuaded.

¶ 27    Under section 19-3-604(1)(c)(I), the juvenile court must find that (1) the parent did not reasonably comply with the treatment plan, or (2) the treatment plan was not successful.  It is a parent's obligation to ensure compliance with and the success of a treatment plan.  *People in Interest of J.A.S.*, 160 P.3d 257, 260 (Colo. App. 2007).  Although absolute compliance with a treatment plan is not required, even substantial compliance may not be sufficient to correct or improve the parent's conduct or condition or to render the parent fit.  *People in Interest of T.E.M.*, 124 P.3d 905, 909 (Colo. App. 2005).

¶ 28    The juvenile court found that father didn't reasonably comply with the treatment plan and that the treatment plan was unsuccessful.  The court also determined that father exhibited the same problems addressed in the treatment plan without adequate improvement.

¶ 29　In support of its decision, the juvenile court relied on evidence that father

- sporadically complied with drug tests and recently tested positive for cocaine;

- attended fewer than half of the scheduled visits over the few months before the termination hearing and none in the month before the termination hearing;

- was discharged from his first domestic violence treatment provider and only recently began treatment with a new provider;

- hadn't engaged with his individual therapist for several months and did not follow through with parenting skills training; and

- didn't fully understand the child's needs or believe the child needed services.

The caseworker testified to each of these points during the termination hearing. Therefore, the record supports the court's findings.

¶ 30　Still, father asserts that the juvenile court erred because the evidence established that he "complied with the treatment plan to

the best of his ability." For example, he maintains that the evidence shows that he had employment and stable housing, engaged in monitored sobriety, participated in individual and group therapy and domestic violence treatment, and attended family time. To be sure, the evidence presented at the termination hearing established that father participated, to some extent, in these services. But the court weighed father's participation in the treatment plan against other evidence of his lack of participation, and it determined that evidence of his lack of participation in certain critical areas, as described above, outweighed the evidence of his participation in those services that he identifies on appeal. *See In re Marriage of Kann*, 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts to weigh conflicting evidence."). What's more, the court determined that, despite father's participation, the treatment plan was unsuccessful because it didn't render him fit. *See E.S.V. v. People in Interest of C.E.M.*, 2016 CO 40, ¶ 20 ("[E]ven substantial compliance may not result in a successful plan that renders the parent fit.").

¶ 31    In sum, because the record supports the juvenile court's findings, we cannot reweigh the evidence or substitute our

judgment for that of the juvenile court. *See S.Z.S.*, ¶ 29. We therefore decline to disturb the judgment.

### D.  Reasonable Efforts

¶ 32 Both parents contend that the juvenile court erred by finding that the Department made reasonable efforts. We disagree.

¶ 33 In determining fitness under section 19-3-604(1)(c), the juvenile court must consider whether the county department of human services made reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" is defined as the "exercise of diligence and care" to reunify parents with their children, and the department's reasonable efforts obligation is satisfied if it provides appropriate services in accordance with section 19-3-208. § 19-1-103(114).

¶ 34 When determined "necessary and appropriate," the department must provide (1) screening, assessments, and individual case plans; (2) home-based family and crisis counseling; (3) information and referral services; (4) family time; and (5) placement services. § 19-3-208(2)(b). The juvenile court should consider whether the services provided were appropriate to support

17

the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 35 The parent is ultimately responsible for using the services to comply with the plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). And the juvenile court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts. *People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 36 The juvenile court determined that the Department made reasonable efforts to rehabilitate the parents and reunite them with the child but that the parents didn't use the resources provided by the Department to become fit. The record supports the court's findings. As father acknowledges, the Department provided him with numerous services, including sobriety monitoring, individual and group therapy, the Child First program, the Circle of Security program, and parenting classes. The record also shows that the

Department provided transportation to visits, and it offered to pay for rent and car repairs. As for mother, the record shows that the Department provided her with sobriety monitoring, therapy, family time services, parenting classes, a domestic violence program, and housing resources.

¶ 37 Despite this record, the parents assert, for various reasons, that the Department failed to make reasonable efforts. We address and reject those arguments below.

¶ 38 Father makes three general arguments: The Department failed to (1) assist him with barriers; (2) focus on reunification; and (3) expand parenting time. Under each of these general arguments, he presents numerous specific contentions.

¶ 39 He first asserts that the Department failed to assist him with barriers related to transportation, his distance from the offered services, conflicts with his employment schedule, and his inability to afford services. But the record shows that the Department offered to assist in these areas. For example, the Department offered to pay for car repairs if father provided an estimate and description of what needed to be fixed, but the caseworker said that father did not take advantage of that offer. Likewise, the

caseworker said that, although the Department could not pay for father's domestic violence treatment because it didn't have a contract with his provider, the Department offered to pay for father's rent so that he could "save that money and use that to pay for domestic violence treatment." The Department also transported the child to and from father's home for visits. As for father's work schedule, the caseworker said the Department offered to change the visitation schedule to accommodate father's work, but even when it switched visits to his day off, father still did not attend family time.

¶ 40    Therefore, although the Department didn't do everything father wanted, considering the totality of the circumstances, we can't say that the juvenile court erred by finding that the Department made reasonable efforts. Notably, father hasn't directed us to anything in section 19-3-208 that the Department failed to provide. For example, section 19-3-208(2)(d)(I) states that the Department must provide transportation to services only if "other appropriate transportation is not available." Apart from noting that his vehicle may have needed repairs at some point, father doesn't assert that he lacked transportation for most of the case. And although the Department is required to provide some

20

services if funds are available, such as drug and alcohol treatment services, nothing in section 19-3-208 specifically requires the Department to pay for domestic violence treatment.

¶ 41   Second, father contends that the Department failed to focus on reunification because it didn't involve his fiancee in the case, only sought permanency with the foster parents, failed to observe father's interactions with the child, and did not provide services in Saguache County. Again, father hasn't directed us to anything in section 19-3-208 requiring the Department to make these efforts. As for father's assertion that the Department failed to provide services in Saguache County, the caseworker testified that, if a parent moves to another county, the Department might reach out to its counterpart in the other county for provider recommendations in that county. The caseworker said that she could have done so in this case, but father never requested it.

¶ 42   Finally, father asserts that the Department failed to expand family time. Section 19-3-208(2)(b) only requires that the Department provide family time services "as determined necessary and appropriate by individual case plans." Said another way, to satisfy the reasonable efforts requirement, the Department must

provide family time as ordered by the juvenile court. Father doesn't assert that the Department withheld any of his court-ordered family time. The record therefore shows that the Department satisfied its burden under section 19-3-208, and we aren't convinced that it had any duty to exercise its discretion to expand family time, especially considering that father wasn't addressing the identified concerns in this case.

¶ 43 Mother also asserts that the Department failed to make reasonable efforts because it didn't provide her with a full domestic violence evaluation. We aren't persuaded.

¶ 44 The domestic violence cycle component of mother's treatment plan required her to schedule an intake with a confidential provider to "learn about domestic violence dynamics in a group or individual setting." The evidence shows that mother engaged in individual therapy, but because she was absent for most of the case, she had not yet begun addressing domestic violence. The caseworker said that she had also talked with mother's therapist about referring her to a domestic violence survivors' group called Seeking Safety, and the therapist agreed that it would be appropriate for mother. However, the therapist expressed concern that mother might be

22

overwhelmed by all the services and recommended it as a "substitute group," rather than an "additional therapeutic intervention."

¶ 45     Therefore, the record shows that the Department provided mother with the appropriate services to support her treatment plan — namely, individual and group therapy. *See S.N-V.*, 300 P.3d at 915. Contrary to mother's argument, her treatment plan didn't require a comprehensive domestic violence evaluation, and therefore the Department didn't have an obligation to provide her one to meet its reasonable efforts requirement, especially considering that mother didn't object to the plan's domestic violence component and never asked the Department for a referral for such an evaluation. At any rate, mother doesn't explain how she could have become a fit parent in a reasonable time even if the Department had referred her for a comprehensive domestic violence evaluation, given that she only actively participated in the case for the final four months. We therefore reject her argument.

## E.     Fitness

¶ 46     Father argues that the juvenile court erred by finding that he was unfit, while mother argues that the court erred by finding that

23

she couldn't become fit within a reasonable time.  We aren't persuaded.

¶ 47     An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).  A parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness." *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008).

¶ 48     In determining whether the parent can become fit within a reasonable time, a juvenile court may consider whether any change has occurred during the case, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *D.L.C.*, 70 P.3d at 588-89.  The determination of a reasonable period is fact specific and varies from case to case.  *S.Z.S.*, ¶ 25. But a reasonable time is not an indefinite time, and it must be

24

determined by considering the child's physical, mental, and emotional conditions and needs. *A.J.*, 143 P.3d at 1152.

¶ 49 The juvenile court found that father was unfit based, in large part, on the same evidence it relied on to determine that he did not successfully comply with his treatment plan as we described, *supra* Part IV.C. *See D.P.*, 181 P.3d at 408. And as already set forth above, the record supports those findings.

¶ 50 Yet father asserts, for the following reasons, that the juvenile court erred.

- Father contends that the court erred by finding him unfit under section 19-3-604(2)(e) because he didn't have a "substance abuse addiction." But subsection (2)(e) doesn't require proof of an "addiction." Rather, it merely allows a court to "consider" evidence of "[e]xcessive use" of "controlled substances" that "affects the [parent's] ability to care and provide for the child." Given that father only sporadically complied with testing and tested positive for a controlled substance, the record supports the court's finding.

- Father asserts that he didn't "lack accountability" and instead that the evidence showed he "supported the child's services" and "demonstrated safe parenting." But the caseworker testified to the contrary, and it was within the juvenile court's purview to weigh this evidence. *See A.J.L.*, 243 P.3d at 249-50; *S.Z.S.*, ¶ 29.

- Father asserts that the court "erroneously relied on expert testimony" when it considered the caseworker's opinions about whether he was fit. But we decline to address this argument because father didn't object to the caseworker's expert testimony in the juvenile court. *See People in Interest of M.B.*, 2020 COA 13, ¶ 14.

¶ 51    Father also asserts, in a single sentence, that the juvenile court erred by finding that he couldn't become fit within a reasonable time. Because father failed to develop this argument, we don't address it. *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (appellate courts don't address arguments that fail to "identify any supporting facts, make specific arguments, or set forth specific authorities to support the contention").

¶ 52    We now turn to mother's assertion that the juvenile court erred by finding that she couldn't become fit within a reasonable time. The court determined that mother couldn't become fit within a reasonable time because, although she had recently made progress, her engagement came too late, especially considering that this case was an expedited permanency planning (EPP) case. *See* § 19-1-102(1.6), C.R.S. 2025 (noting that the EPP provisions require a court to ensure that a child under six years old is placed in a permanent home as "expeditiously as possible"). The record supports the court's finding. The evidence established that mother left Colorado early in the case without providing the Department with a way to contact her. She didn't return to start working on her treatment plan until about four months before the termination hearing. The caseworker opined that mother was unlikely to become fit in a reasonable time because mother couldn't address the child's "specific needs" given her "current challenges."

¶ 53    Mother asserts that she could become fit in a reasonable time because she had made "substantial progress by the time of the termination hearing." There is no doubt that the evidence showed that mother engaged in the treatment plan during the short time

27

that she was involved in the case.  But we must nevertheless reject her assertion because it would require us to reweigh the evidence and substitute our judgment for that of the juvenile court, which we cannot do.  *See S.Z.S.*, ¶ 29; *see also People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998) (noting that even "increased compliance" over the course of a case may not justify more time).

### F.    Less Drastic Alternatives

¶ 54    Father asserts that the juvenile court erred by finding that there was no less drastic alternative to termination.  We disagree.

¶ 55    Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives.  *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986).  In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs.  § 19-3-604(3).

¶ 56    A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests.  *A.M.*, ¶ 27.  Therefore, if the juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order

28

termination. *Id.* at ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

¶ 57 The juvenile court found that there was no less drastic alternative to termination. In reaching its decision, the court noted that (1) the child needed the permanency and stability that only termination and adoption could provide, *see People in Interest of Z.M.*, 2020 COA 3M, ¶ 30; and (2) the foster parents wanted to adopt and did not want to participate in an allocation of parental responsibilities (APR), *see S.N-V.*, 300 P.3d at 920. The record supports the court's findings. Specifically, the caseworker testified that termination and adoption were in the child's best interest because she "need[ed] security and permanency" that couldn't be achieved through an APR. She also testified that the child was doing well in her current foster home, the foster parents wanted to adopt her, and they didn't believe that an APR would be in the child's best interests.

¶ 58 Father doesn't challenge the juvenile court's findings, nor does he attack any of the evidence on which the court relied. Instead, he maintains that we should reverse the termination judgment

because the Department failed to make intensive, ongoing efforts to identify placement options with relatives. We aren't persuaded.

¶ 59    To aid the juvenile court in determining whether there is a less drastic alternative to termination, the department must evaluate a reasonable number of the people identified by the parents as placement options. *D.B-J.*, 89 P.3d at 532. But the department isn't obligated to "independently identify and evaluate other possible placement alternatives." *People in Interest of Z.P.*, 167 P.3d 211, 215 (Colo. App. 2007).

¶ 60    The caseworker testified that the Department investigated all the relatives the parents had identified as potential placement options, but none of those individuals could serve as a placement. *See D.B-J.*, 89 P.3d at 532. In addition, the Department conducted a diligent search for relatives but couldn't identify any other options. *See Z.P.*, 167 P.3d at 215. And father failed to identify any other relatives who were available for placement (and willing to accept an APR) but were not investigated by the Department. For these reasons, we discern no error.

## V. Ineffective Assistance of Counsel

¶ 61    Father contends that his counsel provided ineffective assistance. We discern no basis for a remand.

¶ 62    Under the test for ineffective assistance of counsel in dependency or neglect cases, the parent must establish that (1) counsel's performance was outside the wide range of professionally competent assistance; and (2) the parent was prejudiced by counsel's deficient performance — that is, a reasonable probability exists that, but for counsel's unprofessional errors, the outcome would have been different. *See A.R. v. D.R.*, 2020 CO 10, ¶ 60. "If the parent fails to establish either prong of this test, the claim fails." *People in Interest of C.B.*, 2019 COA 168, ¶ 26.

¶ 63    An appellate court must remand for an evidentiary hearing if a parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel. *A.R.*, ¶ 63. If the parent's allegations lack sufficient specificity, however, the appellate court may summarily deny the ineffective assistance of counsel claim. *Id.*

¶ 64    First, father asserts that his attorney provided ineffective assistance by failing to "object to improper venue." But father cannot establish deficient performance because his attorney, in fact, moved to change venue under section 19-3-201(2), C.R.S. 2025, and only withdrew the motion at father's request. But even if counsel provided ineffective assistance by failing to pursue a change of venue under section 19-3-201(2), father hasn't sufficiently alleged prejudice because a party can only request a change of venue under that section if the department filed the case in "a county other than that of the child's residence." And father doesn't specifically allege that the child's residence was in any county other than Chaffee County.[4]

¶ 65    Second, father contends that his attorney provided ineffective assistance by calling an expert witness who recommended a post-adoption contract because a post-adoption contract was "in direct opposition to [his] interests." Even if counsel performed deficiently

---

[4] In its answer brief, the Department responds to the allegation that father's counsel should have moved to change venue "earlier in the case." But father didn't allege that counsel provided ineffective assistance by failing to move for a change of venue *sooner*. We therefore don't address that issue.

in this regard, father hasn't sufficiently alleged prejudice. He asserts that he was prejudiced because the juvenile court "expressly relied on his expert's post-adoption contract recommendation." Indeed, the court noted father's expert's testimony when finding that there was no less drastic alternative to termination. But we aren't convinced that, but for the expert's testimony, the outcome of the case would have been different. As discussed, *supra* Part IV.F, father didn't propose any less drastic alternatives to termination, and nothing in the record suggests that a less drastic alternative existed. In other words, the expert's testimony had no impact on the court's finding that there was no less drastic alternative to termination. As a result, father's claim fails.

¶ 66 Finally, father argues, "to the extent [that an] issue is raised concerning counsel's failure to ensure the reasonable efforts hearing was completed," his attorney provided ineffective assistance. Father's counsel moved for a finding of lack of reasonable efforts in November 2024, and the juvenile court held an evidentiary hearing in December 2024, which was eventually continued until April 2025 when father's counsel asked the court to hold the motion "in abeyance" because "the issues in the motion

[were] going to be the same issues that [were] going to be litigated in the termination trial." Although father doesn't specifically say so, he presumably argues that, if we were to conclude that if his counsel had waived his reasonable efforts argument by failing to pursue resolution of his motion, then his attorney provided ineffective assistance. Because we haven't done so, we need not address father's argument further.

¶ 67 In sum, we conclude that father hasn't raised sufficiently specific and compelling allegations to create a prima facie showing of ineffective assistance of counsel. *See A.R.,* ¶ 63; *see also People v. Sherman,* 172 P.3d 911, 914 (Colo. App. 2006) (noting that a claim that is too speculative will not satisfy the prejudice prong). Thus, we decline to disturb the termination judgment.

## VI.   Disposition

¶ 68 The judgment is affirmed.

JUDGE LUM concurs.

JUDGE J. JONES concurs dubitante.

JUDGE J. JONES, concurring dubitante.

¶ 69 The majority holds that a guardian ad litem (GAL) may file and prosecute a motion to terminate parental rights. In so holding, it reads the language of *People in Interest of R.M.P.*, 2025 CO 34 — in which the Colorado Supreme Court held that only the State may file and prosecute a dependency or neglect petition — as applying only to that initial phase of a dependency or neglect proceeding. I'm not so sure. But because the majority's conclusion is plausible and I'm not able to conclude with sufficient certainty that the majority is wrong, I concur in the result.[1] Nevertheless, I think it appropriate to explain why I believe *R.M.P.* casts doubt on the majority's conclusion. I begin, though, twenty-eight years before *R.M.P.*

¶ 70 In *People in Interest of M.N.*, 950 P.2d 674, 676 (Colo. App. 1997), a division of this court held that a GAL may file a motion to

---

[1] "Dubitante" is a Latin word meaning "[d]oubting." Black's Law Dictionary 630 (12th ed. 2024). A dubitante opinion can serve a variety of purposes. One such purpose is to express a judge's doubts about a majority's holding — albeit doubts that don't, in the judge's mind, justify a dissent. *See Majors v. Abell*, 361 F.3d 349, 355-58 (7th Cir. 2004) (Easterbrook, J., dubitante) (concurring because "I cannot be confident that my colleagues are wrong"); *see also People v. Carter*, 2021 COA 29, ¶ 60 n.1 (J. Jones, J., concurring dubitante) (describing the different reasons for a dubitante opinion).

terminate parental rights. At least two times since, the supreme court has — in dictum — cited *M.N.* with apparent approval.

¶ 71 In *A.M. v. A.C.*, 2013 CO 16, the court held that foster parents who are allowed to intervene in a dependency or neglect proceeding "may participate fully in [a] termination hearing without limitation." *Id.* at ¶ 1. In reviewing the statutory procedures in a dependency or neglect proceeding, the court said that a parent's "[f]ailure to comply reasonably with [a] treatment plan may provide grounds for the State or the guardian ad litem to file a motion to terminate parental rights." *Id.* at ¶ 14 (first citing § 19-3-604(1)(c), C.R.S. 2012; and then citing *M.N.*, 950 P.2d at 676); *see also id.* at ¶ 5 n.2 ("The guardian ad litem is authorized to file a motion to terminate parental rights." (citing *M.N.*, 950 P.2d at 676)).

¶ 72 Five years later, in *C.W.B. v. A.S.*, 2018 CO 8, the court held that foster parents who had intervened in a dependency or neglect proceeding didn't have standing to appeal a juvenile court's order denying a termination motion. *Id.* at ¶ 2. In the course of "examining the relative duties and rights of the several parties to a dependency and neglect case," *id.* at ¶ 21, it observed that "the GAL may file a motion to terminate the parent-child legal relationship,"

36

*id.* at ¶ 24 (first citing *M.N.*, 950 P.2d at 676; and then citing *A.M.*,

¶ 14).

¶ 73     But then, seven years later, the court decided *R.M.P.*, holding

that "the State, in its role as *parens patriae*, is the sole party that

may prosecute dependency and neglect proceedings." *R.M.P.*, ¶ 4.

The more specific issue in the case was whether a "counsel for

youth," § 19-3-203(2), C.R.S. 2025, can prosecute a dependency or

neglect petition. The court held that such counsel can't and, for

good measure, said that "[n]othing in the Children's Code" gives any

"non-state party" — which would include a GAL — authority to do

so either. *R.M.P.*, ¶ 24.

¶ 74     The majority in this case holds that the supreme court's

rationale in *R.M.P.* is limited to the "first phase of a dependency and

neglect proceeding" — the adjudicatory phase. *Supra* ¶¶ 9-10. Put

another way, the majority concludes that *M.N.* remains good law

after *R.M.P.* As I said above, the majority plausibly explains why,

notwithstanding *R.M.P.*, a GAL can file and prosecute a termination

motion. But the following aspects of *R.M.P.* give me pause:

- As the majority recognizes, the court in *R.M.P* repeatedly
  used the word "proceeding" when speaking about the

State's "sole" authority. Though the majority says the court could only have been referencing the first phase of a proceeding, the supreme court previously, in *People in Interest of S.A.G.*, 2021 CO 38, took pains to emphasize that the "proceeding" in this context is the whole of a dependency or neglect case: A motion to terminate is a remedy within the proceeding, "not the start of a second proceeding." *Id.* at ¶ 39 n.3. Given this history, to conclude that the court in *R.M.P.* meant only a phase of a proceeding when using the term "proceeding" requires assuming that the court overlooked what it previously said in *S.A.G.*

- The court's holding in *R.M.P.* rested on the State's authority as *parens patriae*. *R.M.P.*, ¶¶ 4, 19-20, 23. The State continues to exercise that authority throughout the case and is the only party with such authority. A GAL "represents" the "child's best interests," *id.* at ¶ 2; *see* § 19-3-203(5), C.R.S. 2025, but a GAL doesn't stand in a parent's shoes, *see In re J.C.T.*, 176 P.3d 726, 734-35 (Colo. 2007).

38

- The court in *R.M.P.* said that "to allow a child (or another non-state party, such as a family member or foster parent) to prosecute dependency and neglect actions risks transforming the government's *parens patriae* authority to protect children into a weaponized family court system." *R.M.P.*, ¶ 24. Along the same lines, the court said that "[a]llowing a child (or any non-state party) to override the State's determination that a petition [in dependency or neglect] should be dismissed would be analogous to allowing the victim of a crime to prevent the district attorney from dismissing a criminal case." *Id.* at ¶ 30. Though the court was speaking about a petition in dependency or neglect, it is difficult to see why the same concerns wouldn't apply to the State's determination not to move to terminate parental rights.

- The court in *R.M.P.* spoke about the State's authority to "prosecute a dependency and neglect petition" but also said it was using the term "prosecute" "to mean to 'institute' or to 'pursue' *the legal proceeding*." *Id.* at ¶ 3 &

39

n.1 (emphasis added). Again, in *S.A.G.*, ¶ 39 n.3, the court said that the "proceeding" is the whole of the case.

- Section 19-3-203(5) provides that a GAL "shall . . . participate further in the proceedings to the degree necessary to adequately represent the child."[2] And yet the court in *R.M.P.* held what it held, apparently of the view that this provision doesn't give a GAL, who may be appointed before or after a petition in dependency or neglect is filed, *see* § 19-3-205(1), authority to file or prosecute a petition.

¶ 75    To my mind, all this could be read as broadly applying beyond the context of filing a petition in dependency or neglect. And I'm not alone in taking this view. In *People in Interest of N.K.S.*, 2025 COA 100, ¶ 9 (*cert. granted* Mar. 30, 2026), a division of this court applied the rationale and broad language of *R.M.P.* to hold that a

---

[2] In *People in Interest of R.M.P.*, 2025 CO 34, the supreme court said, "[U]nlike a guardian ad litem, who represents the child's best interests, a counsel for youth represents the child in the same manner as an attorney directly representing a client." *Id.* at ¶ 2 (citing § 19-2-203(5)-(6), C.R.S. 2025). So it appears the court reads "child" in the sentence from section 19-2-203(5) that I quote above as "child's best interests," a reasonable construction given the statutory context.

GAL lacks standing to appeal the denial of a motion to terminate parental rights when the State has elected not to appeal.[3]

¶ 76    All that said, the supreme court hasn't overruled *M.N.*; indeed, it has cited it with approval at least twice, most recently in 2018. But in light of the uncertainty *R.M.P.* has engendered, I would urge the supreme court to clarify the reach of *R.M.P.*  Perhaps it will do so in *N.K.S.*  But that case involves a different issue than this one and may be resolvable based on the language in section 19-3-203(5) giving a GAL the right to "appeal matters to the court of appeals or the supreme court."  This case, however, squarely presents the issue whether a GAL may file and prosecute a motion to terminate parental rights.

---

[3] I also note that section 19-3-602(1.5)(a)(I), C.R.S. 2025, provides that a "motion for termination must . . . [i]nclude a statement indicating what continuing inquiries the county department of human or social services has made in determining whether the child who is the subject of the termination proceeding is an Indian child."  It would seem that only a department would be likely to have that information, indicating that perhaps only a department may file such a motion.  But I may be assuming too much.